IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| MICHAEL BOUNDS, FOREST OLIVIER, WIA DAY, ADAM LAGUNA, DANIEL BELL, and ZACHARY LORENZ,<br><br>Plaintiffs,<br><br>v.<br><br>THE STATE OF MINNESOTA; THE MINNESOTA STATE PATROL; RICCARDO MUNOZ, THE TWENTY-SIX PARTICIPANTS IN THE 2012 "DRUG RECOGNITION EVALUATORS" PROGRAM (OFFICERS MARK HANNEMAN, KARL WILLERS, BARB MATHWIG, BRYCE SCHUENKE, PETER ZAJAC, TROY LUKE, CHRIS MCCALL, MARC SUCHY, TROY KEMP, PAUL IRELAND, MICHAEL HADLAND, MICHELLE NESS, NICHOLAS JACOBSON, CHAD VANHORN, DANIEL LEWIS, STEVE SCHULZ, ANDREW MAHOWALD, JOSHUA LAWRENZ, MATT OLSON, ADAM CONNOR, DUSTIN ROEMELING, KENNETH WILLERS, JOSHUA MCCEWEN, CHRIS HENRICHS, LONNIE ROLOFF, and DAN SHERBURNE); THEIR POLICE DEPARTMENTS (THE HUTCHINSON POLICE DEPARTMENT, THE DAKOTA COUNTY SHERIFF'S OFFICE, THE FARMINGTON POLICE DEPARTMENT, THE WASHINGTON COUNTY SHERIFF'S OFFICE, THE ANOKA COUNTY SHERIFF'S OFFICE, THE RAMSEY COUNTY SHERIFF'S OFFICE, THE COON RAPIDS POLICE DEPARTMENT, THE FILLMORE COUNTY SHERIFF'S OFFICE, THE OLMSTED COUNTY SHERIFF'S OFFICE, THE LAKES AREA POLICE DEPARTMENT, THE KANABEC COUNTY SHERIFF'S OFFICE, THE CHISAGO COUNTY SHERIFF'S OFFICE, THE CHASKA POLICE | Docket No.<br><br>**JURY TRIAL DEMANDED**<br><br><br><br>**COMPLAINT AND JURY TRIAL DEMAND** |

| | |
|---|---|
| DEPARTMENT, THE MAPLE GROVE POLICE DEPARTMENT, THE LYON COUNTY SHERIFF'S OFFICE, THE NOBLES COUNTY SHERIFF'S OFFICE, and THE BIG LAKE POLICE DEPARTMENT); JOHN DOES #1-100; and XYZ ENTITIES #1-100,<br>          Defendants. | |

Plaintiffs Michael Bounds, Forest Olivier, Daniel Bell, Wia Day, and Zachary Lorenz, by and through their counsel, Alan C. Milstein and Michael Dube of Sherman, Silverstein, Kohl, Rose & Podolsky, P.A., and Nathan M. Hansen, by way of Complaint against the Defendants herein, hereby say, state, and aver as follows:

## THE PARTIES

1. Plaintiffs Michael Bounds, Forest Olivier, Adam Laguna, Daniel Bell, Wia Day, and Zachary Lorenz are individuals who are residents of the State of Minnesota.

2. The State of Minnesota is one of the fifty states comprising the United States of America.

3. The Minnesota State Patrol is the official law enforcement arm of the State.

4. At all relevant times, Defendants Mark Hanneman, Karl Willers, and Barb Mathwig of the Hutchinson Police Department, Bryce Schuenke of the Dakota County Sheriff's Office, Peter Zajac of the Farmington Police Department, Troy Luke of the Washington County Sheriff's Office, Chris McCall of the Anoka County Sheriff's Office, Marc Suchy of the Ramsey County Sheriff's Office, Troy Kemp and Paul Ireland of the Coon Rapids Police Department, Michael Hadland of the Fillmore County Sheriff's Office, Michelle Ness and Nicholas Jacobson of the Olmstead County Sheriff's Office, Chad Vanhorn of the Lakes Area Police Department, Daniel Lewis and Steve Schulz of the Kanabec County Sheriff's Office, Andrew Mahowald of

the Chisago County Sheriff's Office, Joshua Lawrenz of the Chaska Police Department, Matt Olson of the Maple Grove Police Department, Adam Connor of the Lyon County Sheriff's Office, Dustin Roemeling, Kenneth Willers, Joshua McCewen, Chris Henrichs, and Lonnie Roloff of the Nobles County Sheriff's Office, and Dan Sherburne of the Big Lake Police Department were duly authorized police officers deputized to perform official functions and acting under color of state law.  These Defendants are being sued in their official and individual capacities.

5. At all relevant times, the foregoing individual Defendants were employed by the Defendant police departments enumerated above.

6. John Does #1-100, and XYZ Entities #1-100, are individuals or entities, whose identities are currently unknown to the Plaintiffs, that bear or may bear responsibility for the incident in suit.

## SUBJECT MATTER JURISDICTION

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States," because this civil action arises under the Constitution and laws of the United States.

8. This Court has supplemental jurisdiction over the Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a), which provides that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution," because the Plaintiffs' state-law claims are so related to the Plaintiff's

federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

## FACTS COMMON TO ALL COUNTS

### I.

9. The Defendants individually and collectively designed, developed, and/or ran a program called the "Drug Recognition Evaluators" program ("DRE Program" or "Program").

10. The DRE Program was essentially an unethical clinical trial whereby armed police officers provided vulnerable members of the public with substantial quantities of marijuana (presumably obtained from police evidence in other cases), encouraged them to get high, observed them, and then abandoned them while they were still high.

11. This Program purportedly existed for the purpose of allowing law enforcement to understand what individuals look and act like while high.

12. In actuality, the parties that designed and ran the Program wished to target members of Occupy Minneapolis, members of the homeless population, and other vulnerable members of the population and see what quantity of drugs their bodies could tolerate.

13. Indeed, officers running the Program were instructed to specifically target Occupy Minneapolis protesters exercising their First Amendment right to free speech and peaceable assembly, and in fact targeted such individuals.

14. Officers running the Program were also instructed to specifically target vulnerable members of the population, including homeless individuals and individuals addicted to illegal drugs such as cocaine and heroin, and in fact targeted such individuals.

15. The targeted individuals were taken into police custody, provided with substantial quantities of drugs (principally marijuana) by the police, observed by the police while under the influence of the drugs, and then simply released onto the streets in a high and incoherent state.

16. Any officers who did not actually participate in this aspect of the Program knew about it, and failed to stop it, in reckless disregard of the Plaintiffs' rights.

17. Additionally, the parties that designed and ran the Program authorized providing, and actually provided, cash or other consideration (such as food, cigarettes, and even illegal drugs to take home) to members of the public in exchange for participation, and sometimes intimated to the "volunteers" that they would be arrested if they did not participate.

18. The Plaintiffs and other "participants" were not provided with an informed consent form, nor could any consent have ever been truly voluntary.

19. The Plaintiffs and other "participants" were not asked to supply any medical history.

20. The Defendants' conduct was contrary to (among other things) the Plaintiffs' First Amendment right to free speech and peaceable assembly, the Plaintiffs' Fourth and Eighth Amendment rights, the Plaintiffs' Fourteenth Amendment rights to bodily integrity, essential human dignity, and privacy, and other rights secured by the Bill of Rights.

21. The Belmont Report, issued in 1979 by the National Commission for the Protection of Research Subjects in Biomedical and Behavioral Research, sets forth three principles to guide human subject research. It provides that, for human subject research to be ethical, the research must be designed in accordance with "the ethical principles of Respect for Persons, Beneficence and Justice." See http://ohsr.od.nih.gov/guidelines/ (last visited December 16, 2012).

22. The DRE Program was contrary to the principle of Respect for Persons because it treated the human subjects as guinea pigs, if not worse.

23. The experiment was contrary to the principle of Beneficence because the risk of injury to human subjects who would be given large quantities of marijuana, observed, and then dropped off in the middle of a major metropolitan area while still in a highly altered state was more than minimal and was outweighed by any possible benefits.

24. The experiment was contrary to the principle of Justice because the experiment exclusively targeted those exercising their free speech rights, the economically disadvantaged, and other vulnerable members of the population.

25. In 1991, federal regulations governing human subject research were integrated into the "Common Rule," the most familiar incarnation of which is the Department of Heath and Human Services regulations found at 45 C.F.R. § 46.101, et seq. These federal regulations, among other things, detail the conditions required for obtaining informed consent and what information must be provided under those conditions, restrict experiments to those in which risks are minimized, require the equitable selection of research subjects, and establish the requirement of institutional review boards.

26. The experiment was contrary to the requirements of the Common Rule in virtually every respect.

**II.**

27. Plaintiff Michael Bounds, a member of the Occupy Minneapolis movement, suffers from epilepsy and schizophrenia.

28. On or around April 26, 2012, Mr. Bounds encountered a two armed officers participating in the DRE Program.

29. Mr. Bounds was asked whether he was high; he responded that he was not. One of the officers in turn responded, "That's alright, we'll get you high."

30. Officers then provided him with a substantial quantity of powerful marijuana.

31. Officers did not conduct any evaluation of him afterwards; rather, he was simply released in downtown Minneapolis while high.

32. Mr. Bounds was also given a quarter of a baggie filled with marijuana to take home in "exchange" for information on the Occupy Minneapolis movement.

33. On three separate occasions on or around April 27, 2012, Plaintiff Forest Olivier, also an Occupy member, was approached by local law enforcement (including Nicholas Jacobson and either Karl Willers or Kenneth Willers) and offered substantial quantities of drugs.

34. On the first occasion, Mr. Olivier was given eight pipe bowls worth of marijuana, taken to a testing facility to be evaluated, evaluated there, and then returned to Peavey Plaza, where the Occupy protesters were gathered.

35. On the second occasion, Mr. Olivier was given ten or more pipe bowls worth of marijuana, taken to the facility to be evaluated, and then returned to Peavey Plaza.

36. On another occasion, Mr. Olivier was approached by an Officer Willers and another officer.

37. Officer Willers asked Mr. Olivier whether he was in possession of any marijuana, to which Mr. Olivier responded no.

38. Thereafter, Mr. Olivier was placed in the back of a squad car, and his personal belongings were placed in the trunk of the vehicle.

39. Officer Willers then provided Mr. Olivier with a substantial quantity of marijuana, which Mr. Olivier smoked in the back of the squad car.

40.     Thereafter, Mr. Olivier was taken to the testing facility, at which point other law enforcement officials refused to let Mr. Olivier in because they identified him as being associated with Occupy Minneapolis, and were wary of footage of the Program that Occupy Minneapolis had posted on YouTube.

41.     Thereafter, Mr. Olivier was taken back downtown and released onto the streets while incredibly high.

42.     The remaining Plaintiffs had similar experiences.

43.     The Defendants' unethical and illegal conduct was first brought to light by Occupy Minneapolis; in response, officers falsely denied the allegations and attempted to cast doubts upon the truthfulness of the Occupy members.

44.     Thereafter, certain officers participating in the program (such as Deputy Andrew James Mahowald of the Chisago County Sheriff's Office) began making the same allegations, which triggered an investigation by the Minnesota Bureau of Criminal Apprehension ("Bureau").

45.     Indeed, Officer Mahowald personally witnessed Mr. Olivier being provided drugs by an Officer Willers, and provided details to the Bureau during the investigation.

46.     Tellingly, six police officers (including but not limited to Officer Karl Willers, Officer Hanneman, and Officer Schuenke) refused to provide statements to the Bureau.

47.     During the investigation, one officer testified as to his belief that instructors "skirted the line" in connection with the Program, while another testified that "morals are gone."

48.     According to multiple individuals, Officer Kenneth Willers or Officer Karl Willers openly admitted to providing illegal drugs to individuals, and questioned what was wrong with that.

49.     After these abuses came to light, the DRE Program was suspended.

50. As a result of the Defendants' individual and collective wrongdoing, the Plaintiffs have suffered physical and emotional damages and harm, and been deprived of their well-established rights under the United States Constitution, the Minnesota Constitution, federal law, and state law.

## COUNT ONE –  LIABILITY UNDER 42 U.S.C. §§ 1983 AND 1988

51. The Plaintiffs repeat the foregoing allegations as if fully set forth herein.

52. 42 U.S.C. § 1983 provides, in pertinent part, as follows: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress."

53. The Defendants (except for the State of Minnesota and the Minnesota State Patrol, which are being sued for prospective injunctive relief only) are all "persons" within the ambit of 42 U.S.C. § 1983.

54. The Defendants acted "under color of" state law because they exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  See West v. Atkins, 487 U.S. 42, 49 (1988) (quoting United States v. Classic, 313 U.S. 299, 326 (1941).  Indeed, it could not be more well-established that police officers act under color of state law.  See Monroe v. Pape, 365 U.S. 167, 172 (1961).  Moreover, the Defendants acted within the actual and apparent scope of their authority and office.

55. Furthermore, the police officers were acting in accordance with their employers' official policy and custom, including but not limited to their employers' negligent training or

failure to train about (1) providing illegal drugs to members of the public, (2) experimenting upon the public, (3) targeting individuals exercising First Amendment rights, and (4) reporting misconduct by fellow police officers.

56.   There was a direct and proximate causal connection between the Defendants' wrongful conduct and the harm and damages that resulted.

57.   The Defendants' conduct deprived the Plaintiffs of their rights under the First, Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, and other rights secured by the Bill of Rights, as well as other federally secured rights, and failed to protect the Plaintiffs from injury.

58.   The Defendants' conduct was "arbitrary, or conscience shocking, in a constitutional sense." See Board of Regents v. Tomanio, 446 U.S. 478 (1980).

59.   Indeed, the Defendants' conduct "clearly established statutory or constitutional rights of which a reasonable person would have known."   Harlow v. Fitzgerald, 457 U.S. 800 (1982).  A version of the DRE Program exists in other states, and, on information and belief, there has been no other situation in which police officers actually offered illegal drugs to members of the public.

60.   The Defendants acted with deliberate indifference towards the Plaintiffs' medical needs, recklessly disregarded their rights, and acted with an improper motivation.

61.   The Defendants had no legitimate, much less compelling, reason to perform an experiment of the nature described herein upon members of Occupy Minneapolis, Minneapolis' poor population, or anyone at all.

62.   The State of Minnesota and the Minnesota State Patrol should be prospectively enjoined from running the DRE Program now and in the future.

63. From the remaining Defendants, the Plaintiffs seek all legally recoverable damages, including but not limited to compensatory and punitive damages, and dignity damages, as well as their attorney's fees, litigation expenses, and court costs.  See 42 U.S.C. § 1983; accord id. § 1988.

**WHEREFORE**, the Plaintiffs demand a judgment in their favor, and against the Defendants, in an amount exceeding $1,000,000, compensatory damages, punitive damages, dignity damages, attorney's fees, litigation expenses, and court costs (except that only prospective injunctive relief and any available attorney's fees, litigation expenses, and court costs are sought from the State of Minnesota and the Minnesota State Patrol).

### COUNT TWO – MINNESOTA TORT CLAIMS ACT LIABILITY

64. The Plaintiffs repeat the foregoing allegations as if fully set forth herein.

65. The Defendants' conduct, as described above, violates the Minnesota Tort Claims Act, codified at Minnesota Statute § 3.736, and is not subject to any immunity set forth therein.

66. In connection with these violations, the Plaintiffs seek all legally recoverable damages, including but not limited to compensatory and punitive damages, and dignity damages, as well as their attorney's fees, litigation expenses, and court costs.

**WHEREFORE**, the Plaintiffs respectfully demand a judgment in their favor, and against the Defendants, in an amount exceeding $1,000,000, compensatory damages, punitive damages, dignity damages, attorney's fees, litigation expenses, and court costs.

### DEMAND FOR JURY TRIAL

The Plaintiffs hereby demand a trial by twelve (12) jurors as to all counts and causes of action.

Dated: February 1, 2013						Respectfully submitted,

          By:   /e/ Nathan M. Hansen
               Nathan M. Hansen
               Attorney at Law
               2440 North Charles Street, Suite 242
               North St. Paul, MN 55109
               Telephone: 651-704-9600
               Facsimile: 651-704-9604
               MN Attorney Reg. No. 0328017
               E-Mail: nathan@hansenlawoffice.com

*- and -*

SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.

          By:   Alan C. Milstein (*pro hac vice* pending)
               Michael Dube (*pro hac vice* pending)
               308 Harper Drive, Suite 200
               Moorestown, NJ 08057
               Telephone: 856-662-0700
               Facsimile: 856-488-4744
               E-Mail: amilstein@shermansilverstein.com

*Attorneys for the Plaintiffs*