UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Michael Bounds, Forest Olivier,
Wia Day, Adam Laguna, Daniel Bell            Civil No.  13-266 (JRT/FLN)
and Zachary Lorenz.

            Plaintiffs,

    v.                                       **REPORT AND**
                                             **RECOMMENDATION**
Mark Hanneman, et al., and
The Hutchinson Police
 Department, et al.,

            Defendants.

_____

Alan Milstein and Michael Dube for Plaintiffs.
Jason Hiveley for "City and County" Defendants.
Thomas Haluska for Anoka County Defendants.
Kimberly Parker for Ramsey County Defendants.
Andrea White for Dakota County Defendants.
James Spencer for Olmstead County Defendants.
_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on July 22,

2013 on Defendants' motions to dismiss (ECF Nos. 32, 37, 40, 46 and 63). Defendants' motions

were referred to the undersigned for Report and Recommendation (R&R) pursuant to 28 U.S.C. §

636 and Local Rule 72.1. For the reasons set forth below, this Court recommends that the

Defendants' motions be **GRANTED in part** and **DENIED in part**.

## I. BACKGROUND

During the spring of 2012, twenty-six (26) law enforcement officers from multiple

1

Minnesota counties participated in a Drug Recognition Evaluator (DRE) program facilitated by the Minnesota State Patrol. ECF No. 1. The Minnesota DRE program started in 1991 and is designed to train law enforcement officers on how to detect individuals under the influence of specific drugs.[1] Typically, officers who participate in the program are instructed to identify individuals who they suspect are already under the influence of certain illegal drugs in order to observe them while they are impaired. *See* The Bureau of Criminal (BCA) Investigation Report, ECF No. 49, DC0004.

Here, Plaintiffs allege that the officers who participated in the 2012 DRE program were instructed to target and recruit specific segments of the Minneapolis population, including those who were involved in the Occupy Minnesota protests and the homeless. ECF No. 1, ¶¶ 13 and 14. What's more, instead of simply recruiting those who were already impaired, Plaintiffs allege that the DRE officer trainees were instructed to provide citizen recruits with illicit drugs to ingest. *Id.* Some Plaintiffs who participated at the officers' request were taken to an evaluation facility for observation. *Id.* at ¶ 15. After the DRE officer trainees observed those taken into custody, they dropped the citizen recruits off in downtown Minneapolis in a "high and incoherent state." *Id.* Other Plaintiffs allege that they were given cash or other consideration (including illegal drugs) for their participation and/or in exchange for information about the Occupy Movement. *Id.* ¶ 17. Finally, Plaintiffs allege that the DRE officer trainees intimated to the citizen recruits that they would be arrested if they did not agree to participate in the program. *Id.*

## A.    Plaintiff Michael Bounds

---

[1]    For more information on the Minnesota DRE program, see the Minnesota State Patrol's website, available at https://dps.mn.gov/divisions/msp/about/Pages/special-assignments-drug-recognition-expert.aspx.

Plaintiff Michael Bounds is a member of the Occupy movement who suffers from epilepsy and schizophrenia. *Id.* ¶ 27. He alleges that on or around April 26, 2012, he was approached by two DRE officer trainees. *Id.* ¶ 28. One of the officers asked him if he was "high." *Id.* at 29. He indicated that he was not. *Id.* One of the officers replied "That's alright, we'll get you high." *Id.* Bounds alleges that he was then given a large amount of marijuana. *Id.* ¶ 30. He also alleges that he was not formally observed. *Id.* ¶ 31. Finally, he claims that he was given a quarter baggie of marijuana to take home in exchange for information on the Occupy movement. *Id.* ¶ 32.

### B.     Plaintiff Forest Olivier

Plaintiff Forest Olivier alleges that on three separate occasions in late April 2012, he was approached by several DRE officer trainees, including Nicholas Jacobson and either Karl Willers or Kenneth Willers.[2] Each time, Olivier was offered a large amount of marijuana. *Id.* ¶ 33.  Olivier alleges that on the first occasion, he was given eight bowls of marijuana to smoke, taken to an evaluation facility to be observed and then returned to Peavy Plaza where the Occupy protesters were gathered. *Id.* ¶ 34. The second occasion was similar, though Olivier was given 10 or more bowls to smoke. *Id.* ¶ 35. On the third and final occasion, Olivier claims that he was placed in the back of a squad car where he was provided with large amounts of marijuana to smoke. *Id.* ¶ 39. He was taken to the evaluation facility, but was not allowed in because other officers recognized him as an individual associated with a recently published YouTube video that suggested police were giving drugs to Occupy protesters. *Id.* ¶ 40. Olivier was taken back to downtown Minneapolis and released. *Id.*

---

[2]

Presumably, Plaintiff Olivier names "either Karl Willers or Kenneth Willers" because the name tag of both officers read "K. Willers."

### C.        The Minnesota Bureau of Criminal Apprehension (BCA) investigation.

After many of the allegations included in Plaintiffs' complaint were made public in the spring of 2012, Minnesota's DRE program was suspended.[3] Plaintiffs allege that some DRE officer trainees falsely denied the public allegations made by the citizen recruits. *Id.* ¶ 43. At least one DRE officer trainee from Chisago County, however, reported allegations to his supervisor that support the Occupy members' version of events. *Id.* ¶ 44. The public controversy about the DRE program prompted the BCA investigation. *Id.*; *See also* ECF No. 49. Plaintiffs allege that at least six police officers refused to provide statements to those conducting the BCA investigation. ECF No. 1 at ¶ 46. Although the BCA report is arguably embraced by Plaintiffs' pleadings, the Court declines to consider the report in its entirety for the purposes of this R&R.

### D.        Remaining claims and Defendants.

Plaintiffs voluntarily withdrew several counts made against the Defendants in their original complaint. ECF No. 51 at 2. Two counts brought under section 1983 remain: a First Amendment retaliation claim and a Fourteenth Amendment right to bodily integrity claim. *Id.* Some defendants named in the original complaint have also been voluntarily dismissed. For example, in May 2013 the parties stipulated to the dismissal of the State of Minnesota and the Minnesota State Patrol.[4] ECF Nos. 56 and 59. Defendants that remain in the case include the 26 DRE officer trainees who

---

[3]

> It appears that Minnesota law enforcement officers will now be completing a similar training in California. *See* Rachel Slavik, *Drug Recognition Program Revamped After Controversy*, CBS MINNESOTA (June 7, 2013), *http://minnesota.cbslocal.com/2013/06/07/minn-officials-revise-touchy-drug-patrol-program/*.

[4]

> At the hearing, Plaintiffs explained that the sovereign immunity doctrine under the Eleventh Amendment prevented their suit against the State of Minnesota and the State Patrol.

4

participated in the 2012 DRE Program, the county sheriff and/or police department that each of those officers is associated with, John Does #1-100 and XYZ entities #1-100.

## II. LEGAL STANDARD

To determine the adequacy of a complaint under Rule 12(b)(6), the Court must construe the complaint liberally and afford the plaintiff all reasonable inferences to be drawn from the facts pled. *See Turner v. Holbrook*, 278 F.3d 754, 757 (8th Cir. 2002). For the purpose of a motion to dismiss, facts in the complaint are assumed to be true. *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 738 (8th Cir. 2002). Nevertheless, dismissal under Rule 12(b)(6) serves to eliminate actions that are fatally flawed in their legal premises and designed to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity. *See Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).

To avoid dismissal, a complaint must allege facts sufficient to state a claim as a matter of law and may not merely state legal conclusions. *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir. 1998). A pleading must contain enough facts to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). The plausibility standard is not akin to a "probability requirement," but it calls for more than a sheer possibility that a defendant has acted unlawfully. *Iqbal*, 129 S. Ct. at 1949. In sum, determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* Where the court finds that the facts alleged "do not permit the court to infer more than the mere possibility of misconduct," the pleader is not entitled to relief. *Id.*, (citing Fed. R. Civ. P. 8(a)(2)).

## III. ANALYSIS

**A.** **The sheriff and/or police departments named in the complaint should be dismissed.**

Defendants argue that the sheriff and/or police departments named by Plaintiffs in the compliant are not legal entities subject to suit. ECF Nos. 34 at 19; 39 at 12; 42 at 17; 48 at 35; and 64. The Court agrees. *E.g. Anderson v. City of Hopkins*, 805 F. Supp. 2d 712, 719 (D. Minn. 2011); *Franco v. Grant,* Civ. No. 09-0552, 2010 U.S. Dist. LEXIS 15241, *6 (D. Minn. Feb. 22, 2010) ("A municipal police department is not a cognizable legal entity, or person, subject to suit under § 1983, but is simply part of a larger municipality."). At the hearing, Plaintiffs acknowledged that they may have named the wrong entities and expressed their willingness to seek leave to amend the complaint in order to name the appropriate city and county associated with the corresponding sheriff and/or police department identified. In the meantime, Defendants' motions to dismiss all claims against the sheriff and/or police departments should be granted.

**B.** **Insufficient facts are pled against 23 of the 26 officers who participated in 2012 DRE.**

The Defendants argue that insufficient facts are pled against the individual officers named in the complaint. ECF Nos. 34, 39, 42, 48 and 64. Plaintiffs' counsel acknowledged at the hearing that the complaint was painted with a "broad brush." Draft Transcript at 29:22 - 30:11. Plaintiffs argue that absent discovery, they have no way of determining which individual officers— other than the three officers identified by Plaintiff Olivier—participated directly in the alleged constitutional violations. *Id.* Plaintiffs suggest that discovery should proceed against all 26 DRE officer trainees and that, after sufficient discovery is complete, they will voluntarily dismiss claims against any officer for whom discovery does not reveal sufficient facts to maintain a viable claim. *Id.* The pleading standard established by *Twombly* and *Iqbal* does not allow for Plaintiffs' proposed process.

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

Section 1983 imposes liability on state officials who, under the color of law, deprive citizens of any "rights, privileges, or immunities secured by" federal law. 42 U.S.C. § 1983. *See Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (noting that section 1983 is not a source of substantive rights, but rather provides a method for vindicating federal rights conferred elsewhere). The doctrine of respondeat superior does not apply to section 1983 actions. *Frentzel v. Boyer*, 297 Fed. Appx. 576, 577 (8th Cir. 2008). Thus, to maintain a viable suit under section 1983, plaintiffs must "plead that each Government-official defendant, through the official's own actions, has violated the constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

Here, only Officers Nicholas Jacobson, Karl and/or Kenneth Willers and two John Does are named in the body of the complaint for their alleged interactions with Plaintiffs Olivier and Bounds. Because no specific facts are alleged against the other 23 DRE officer trainees, Defendants' motions to dismiss the claims against those individuals should be granted. The claims should be dismissed without prejudice and, if Plaintiffs uncover facts during discovery that are sufficient to maintain a viable claim against any of those 23 officers, Plaintiffs should seek leave to amend their complaint to properly plead claims against them.

**C.      Insufficient facts are pled by Plaintiffs Day, Laguna, Bell and Lorenz.**

The facts pled by Plaintiffs Day, Laguna, Bell and Lorenz can be summarized by paragraph 42 of the complaint which states "The remaining plaintiffs had similar experiences." ECF No. 1 ¶ 42. This allegation is wholly insufficient to state a claim against anyone, including the John Does. "[A]n action may proceed against a party whose name is unknown if the complaint makes

7

allegations specific enough to permit the identity of the party to be ascertained after reasonable discovery." *Garcia v. Anderson*, 2009 U.S. Dist. LEXIS 79000, 18 (D. Minn. Aug. 13, 2009) (internal citations omitted). Should Plaintiffs Day, Laguna, Bell and Lorenz seek to plead claims in any future amended complaint, each plaintiff—individually—must set forth with specificity the actions that any unknown John Doe Defendant took against them. *Iqbal*, 556 U.S. at 677.

### D.      Sufficient facts are pled by Plaintiffs Olivier and Bounds.

The facts alleged by Plaintiff Olivier against Officers Jacobson, Karl and/or Kenneth Willers and by Plaintiff Bounds against John Doe 1 and 2 are, however, sufficient to survive Defendants' motions to dismiss. The plausibility of a plaintiff's claim is reviewed "as a whole, not the plausibility of each individual allegation." *Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893, 896 n.4 (8th Cir. 2010). Assuming all of the allegations in the complaint are true, Officers Jacobson and at least one of the Willers interacted with Plaintiff Olivier on at least three separate occasions and provided Olivier with marijuana to smoke during each interaction. ECF No. 1 at ¶¶ 33- 40. Plaintiff Olivier alleges that every time the officers approached him, he was participating in Occupy protests. Two of the three times he was subsequently observed at the evaluation facility and then returned to downtown Minneapolis. *Id.*[5] Similarly, Plaintiff Bounds alleges that he was approached by two officers (John Doe 1 and 2) on or around April 26, 2012 and that he was given a large amount of marijuana to smoke. ECF No. 1 at ¶ 29. He also alleges that he was given some marijuana to take home in exchange for information about the Occupy Movement. ECF No. 1 at ¶ 32.

---

[5]

Plaintiff Olivier notes that he was not observed during his third trip to the evaluation site because other officers' associated him with the YouTube video that made many of Plaintiffs allegations public.

Based on these facts, Plaintiffs Olivier and Bounds have alleged a plausible claim that the three named officers[6] and two John Does violated their constitutional rights. *Iqbal*,  556 U.S. 662 at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). The Defendants' motions to dismiss all claims against these Defendants should be denied.

E.    **Plaintiffs' Olivier and Bounds' section 1983 claims against Defendants Nicholas Jacobson, Karl and/or Kenneth Willers and John Does 1 and 2.[7]**

The remaining Defendants argue that they are entitled to qualified immunity. The Court disagrees. The doctrine of qualified immunity protects state actors from personal liability under section 1983 unless the official's conduct "violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Burton v. Martin*, 2013 U.S. App. LEXIS 24929, *17 (8th Cir. 2013). The "driving force" behind the creation of the doctrine was to eliminate insubstantial claims against government officials prior to discovery. *Anderson v. Crieghton*, 483 U.S. 635, 640 n.2 (1987). Two questions are considered to determine whether government officials are protected by qualified immunity: (1) whether the facts alleged by plaintiffs, viewed in their

---

[6]    As noted in the background section, Plaintiff Olivier's allegations appear to pertain to only one of the "K.Willers" named in the complaint. The Court understands that Karl and Kenneth Willers serve in different Minnesota counties. Presumably, distinguishing between the two is impossible because both of their uniform name badges read "K.Willer." Under these circumstances, the Court recommends allowing discovery to proceed in regard to both "K.Willers" until it can reasonably be determined which one is responsible for the allegations levied by Plaintiff Olivier.

[7]    Hereinafter, "Plaintiffs" refers to Plaintiff Olivier and Bounds. The Court notes that Officer Jacobson serves in Olmsted County, Officer Karl Willers serves in Hutchinson County and Officer Kenneth Willers serves in Nobles County. Olmsted county has adopted Ramsey Counties' arguments (ECF Nos. 64 and 34), but did not submit a reply brief. Hutchinson and Olmsted Counties are represented by the "City and County Defendants" memorandum. ECF No. 39.

favor, support a finding that the conduct of the officers violated a constitutional right, and (2) whether that constitutional right was "clearly established" at the time of the incidents such that a reasonable officer would have known that his or her actions were unlawful. *Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009).The order in which the two criteria are addressed is left to the  courts' sound discretion. *Id.* at 818. Here, the Court will begin with an analysis of the first criterion for Plaintiffs' First and Fourteenth Amendment claims.

### 1.    Plaintiffs' constitutional right to be free from retaliation when exercising their First Amendment rights.

"A citizen's right to exercise First Amendment freedoms 'without facing retaliation from government officials is clearly established.'" *Baribeau v. City of Minneapolis,* 596 F.3d 465, 478 (8th Cir. 2010) (citing *Kilpratrick v. King*, 499 F. 3d 759, 767 (8th Cir. 2007)). To survive a motion to dismiss, the facts pled by Plaintiffs must be sufficient to raise a reasonable expectation that discovery will reveal evidence that (1) Plaintiffs were engaged in a protected activity, (2) government official(s) took adverse action against Plaintiffs that would chill a person of ordinary firmness from continuing in the activity and (3) the adverse action was motivated at least in part by the exercise of the protected activity. *Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013); *Delgado-O'Neil v. City of Minneapolis*, 2009 U.S. Dist. LEXIS 123497, *19 (D. Minn. Dec. 3, 2009). The parties agree that Plaintiffs were engaged in protected activity. Defendants, however, argue that discovery is unlikely to reveal facts that would help Plaintiffs prove that a "chilling effect" resulted from any adverse action taken against them, or that there was a connection between the alleged adverse action and the protected activity. ECF Nos. 34 at 10-11 and 39 at 6. The Court disagrees.

As a general matter, an adverse action is retaliatory conduct that would deter an individual

who is similarly situated to the plaintiff from exercising his or her constitutional rights. *See Washington v. County of Rockland*, 373 F.3d 310, 320 (2nd Cir. 2004). Here, the adverse action is alleged to be the DRE officer trainees recruitment of citizens to participate in the DRE program. Plaintiffs argue that, from an objective point of view, a person of "ordinary firmness" would have been deterred from continuing to participate in the Occupy protests after observing officers approach and recruit individuals who were also participating in the protest. *Garcia v. City of Trenton*, 348 F.3d 726, 728 (8th Cir. 2003) ("The ordinary-firmness test is well established in the case law, and is designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment.")

In the Court's view, the facts alleged by Plaintiffs are sufficient to allow discovery on the question of whether individuals were deterred from participating in the Occupy protests because of the DRE officer trainees' actions. Although it is not uncommon for law enforcement to be present at protests, the Court surmises that the average protester would find it unusual for the police to take fellow protesters into custody unless it was clear that those protesters were breaking the law. This is especially so if the DRE officer trainees returned day after day to recruit citizens for their observation purposes. In short, watching uniformed police officers repeatedly take protesters away in their squad cars may have been enough to deter a protester of ordinary firmness from continuing to exercise their First Amendment Rights.

Finally, in regard to the third element of a retaliation claim, Plaintiffs allege that the police were instructed to target the Occupy protesters, and that on at least one occasion, the police provided marijuana to Plaintiff Bounds in exchange for information about the Occupy movement. ECF No. 1, ¶¶ 13, 14 and 32. Based on this allegation—which must be accepted as true at this stage of the

litigation—the Court concludes that the actions of the DRE officer trainees were motivated, at least in part, by Plaintiffs' participation in the Occupy protests.

For these reasons, Defendants' motions to dismiss Plaintiffs' First Amendment claim should be denied. As stated by Judge Posner in *Bart v. Telford*, "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights, it need not be great in order to be actionable." 677 F. 2d 622 (7th Cir. 1982). The facts alleged by Plaintiffs are sufficient to state a prima facie claim that their constitutional rights under the First Amendment were violated by the DRE officer trainees.

### 2.    Plaintiffs' constitutional right to bodily integrity under the Fourteenth Amendment.

The Due Process Clause of the Fourteenth Amendment states "nor shall any State deprive any person of life, liberty or property, without due process of law." U.S. CONST. amend. XIV,  § 1. Substantive due process protections generally pertain to issues relating to marriage, family, procreation and the right to bodily integrity. *Albright v. Oliver*, 510 U.S. 266, 272 (U.S. 1994). "The integrity of the individual person is a cherished value of our society. *Schmerber v. Cal.*, 384 U.S. 757 (1966). However, only government action that violates an individual's integrity in a way that "shocks the conscience" should be found arbitrary in the constitutional sense. *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 129 (1992). And, although the measure of what is conscience -shocking "is no calibrated yard stick . . . it does point the way." *Id.* at 1717 (internal citation omitted); *See, e.g., Rochin v. California*, 342 U.S. 165, 171 (1952) (the forcible extraction of stomach contents shocks the conscience and violates due process); *Washington v. Harper*, 494 U.S. 210, 229 (1990) ("forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty").

When analyzing an alleged Fourteenth Amendment violation, courts must strike a balance between the individual liberty interests at stake and the state's legitimate interests. *In re Cincinnati Radiation Litig.*, 874 F. Supp. 796, 811-812 (S.D. Ohio 1995) (internal citations omitted). However, where a government actor is afforded a "reasonable opportunity to deliberate various alternatives prior to electing a course of action, the chosen action will be deemed 'conscience shocking' if the action was taken with 'deliberate indifference.'" *Neal v. St. Louis County Bd. of Police Comm'rs*, 217 F.3d 955, 958 (8th Cir. 2000) (citing *Lewis*, 523 U.S. at 1719). "We have emphasized time and again that 'the touchstone of due process is protection of the individual against arbitrary action of government.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (internal citations omitted).

Here, the question is whether the DRE officer trainees' recruitment of Plaintiffs to smoke large amounts marijuana for the purposes of their observational training violated Plaintiffs' liberty interest and right to bodily integrity. The parties highlight Fourteenth Amendment jurisprudence in medical experiment cases, which generally require plaintiffs to show that "(1) a government actor, (2) without obtaining informed consent and utilizing false pretenses to obtain participation, (3) conducted medical experiments known to have no therapeutic value and indeed known to be possibly harmful to the subjects." *Heinrich ex rel. Heinrich v. Sweet*, 62 F. Supp. 2d 282, 314 (D. Mass. 1999). It is unclear that an "experiment"—let alone a "medical experiment"—took place in this case based on the facts alleged by Plaintiffs. It remains unknown the extent to which the DRE officer trainees took notes of their observations for later scientific analysis—or whether Plaintiffs were medically analyzed at the observation center.[8] Regardless, the elements necessary to prove a substantive due process violation in the context of medical experiments are informative—but not

---

[8]     These are facts that may well be difficult, if not impossible, for Plaintiffs to know absent discovery.

dispositive or even necessary—to conclude that discovery will likely reveal facts that would support the finding of a Fourteenth Amendment violation in this case.

The gravamen of Defendants' argument is that because one cannot be forced to smoke marijuana, the Court must conclude that the citizen recruits voluntarily agreed to participate in the DRE program. To that end, Defendants' argument emphasizes that courts have declined to find a constitutional violation when persons voluntarily participate in medical experiments. *E.g. Wright v. Fred Hutchinson Cancer Research Center*, 269 F.Supp. 2d 1286, 1291 (D. Wash. 2002) (declining to find a constitutional violation where defendants' alleged actions in failing to obtain informed consent were "random and unauthorized" and because there were "adequate post-deprivation remedies for their alleged conduct . . . ."). The question of voluntariness, however, is not as simple as Defendants suggest; possible coercion, trickery, lack of information and other contextual realities must be considered. *See In re Cincinnati Radiation Litig.*, 874 F. Supp. 796, 811-812 (S.D. Ohio 1995) (holding that the voluntariness of low-income terminally ill cancer patients' participation in an unconstitutional radiation experiment was not clear because (1) the hospital where they sought treatment may have been the only hospital willing to treat indigent patients in the city and (2) plaintiffs were not specifically informed that the radiation they were receiving was for a military experiment rather than treatment of their cancer.)

Critical to the Court's analysis in this case is Plaintiffs' allegation that the police sometimes "intimated to the 'volunteers' that they would be arrested if they did not participate." ECF No. 1 at ¶ 17. This allegation, when considered in light of the circumstances of this case, is enough for the Court to reasonably infer that discovery may reveal evidence that would support Plaintiffs' claim that their participation in the DRE program was *not* voluntary. The DRE officer trainees were dressed in full uniform when they approached Plaintiffs. The officers approached Plaintiffs at the

14

site of a protest. ECF No. 1. An objectively reasonable person in Plaintiffs' shoes would question the sincerity of a law enforcement officers' provision of an illicit drug for their immediate consumption with no strings attached. These contextual realities are ripe for police coercion, whether verbalized or implied more subtly. For these reasons, the Court cannot conclude that Plaintiffs participation in the program was voluntary. "Consent that is the product of official intimidation or harassment is not consent at all." *Fla. v. Bostick* , 501 U.S. 429, 438 (U.S. 1991) (internal quotations omitted).

Moreover, as noted by Plaintiffs, the court in *Wright v. Fred Hutchinson Cancer Research Center* declined to find a constitutional violation in light of the patients' voluntary participation because the treatment at issue—while unproven—was hoped to be of some benefit to the patients. *Id.* at 1295. Here, Plaintiffs were recruited solely for the DRE officer trainees' benefit. "The judiciary has not hesitated to find that, where [ ] the government conducted the experiments knowing they had no therapeutic value, the subject's constitutionally protected right to life and/or liberty had been violated." *Id* at 1294 (internal citations omitted).

Further, the manner in which the DRE observation was conducted demonstrates the officers' deliberate indifference to Plaintiffs bodily integrity. Although marijuana is not generally considered a lethal drug when used recreationally, it remains a Schedule I drug under federal law, like heroin and lysergic acid diethylamide (LSD). 21 U.S.C. 1308.11. According to Plaintiffs, the DRE officer trainees gave the citizen recruits large amounts of marijuana (8-10 bowls at a time) and then, after observation, released them on the streets of downtown Minneapolis. At least one of the citizen recruits suffers from pre-existing health conditions, including epilepsy and schizophrenia. ECF No. 1 at ¶ 27. Although significant physical injury is not alleged by Plaintiffs, the facts of this case smack of arbitrary government action coupled with de minimis legitimate state interest. Surely there

are more appropriate ways to train police in the art of identifying impaired persons rather than having the police provide sober citizens with illicit drugs to ingest, only to release those citizens on the streets of a major urban center while still impaired. Based on the facts alleged, the DRE officer trainees had ample time to consider the consequences of their conduct. Because the DRE officer trainees' actions were deliberate and indifferent to Plaintiffs' liberty interests and bodily integrity, their conduct was sufficiently brazen to conclude that it "shocks the conscience." For all of these reasons, Plaintiffs' Fourteenth Amendment claim should not be dismissed.

### 3. The First and Fourteenth Amendment rights of Plaintiffs were clearly established at the time they were allegedly violated.

The second prong of the qualified immunity analysis focuses on whether the constitutional right allegedly violated was so "clearly established" at the time that a reasonable officer would have known that his or her actions were unlawful. *Pearson v. Callahan*, 555 U.S. 223 (2001). The Supreme Court has made clear that there need not be a case with materially or fundamentally similar facts in order for a reasonable person to know that his or her conduct violated the Constitution. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent.") (internal citations and quotations omitted).

Defendants do not dispute that the fundamental constitutional protections discussed *supra* were clearly established at the time of the alleged unconstitutional conduct of the DRE officer trainees. Rather, Defendants argue that it was not clearly established at the time Plaintiffs were recruited that their "participation in the DRE program" would violate any of their constitutional rights. The Court disagrees. Although the facts of this case are unique, "[i]t is now well-established

that officials can still be on notice that their conduct violates established law even in novel factual circumstances . . . ." *Sisney v. Reisch,* 674 F.3d 839, 847 (8th Cir. 2012).

Important to the Court's analysis is the fact that marijuana remains an illicit drug in Minnesota and under federal law. Both of Plaintiffs' constitutional claims were well established at the time they were recruited by the DRE officer trainees and the provision of marijuana is central to both constitutional claims. In light of these facts, the Court concludes that a reasonable officer would have known that the alleged conduct of the DRE trainees in this case was both unlawful and unconstitutional. Thus, Plaintiffs' claims against the remaining officers in their individual capacities should not be dismissed.[9]

### D. County liability for failure to train.

Finally, the Court turns to whether the Plaintiffs' allegations against Officers Jacobson, Karl and/or Kenneth Willers and the two John Does in their official capacities can be maintained against the associated counties under a theory of failure to train. Defendants argue that the counties cannot be liable for a failure to train because the State Patrol is in charge of the DRE training program. ECF No. 34 at 20. Plaintiffs seek to prove that the counties failed to properly train their officers in regard to (1) providing illegal drugs to members of the public, (2) experimenting on the public, (3) targeting individuals exercising their First Amendment rights and (4) fellow officers' misconduct. ECF No.

---

[9]

Defendants' argument that the DRE training program and others like it have been "judicially recognized as reliable and effective law enforcement tools" is irrelevant. ECF No. 34 at 18. The judicial recognition noted by Defendants relates solely to whether the opinion of DRE trained officers is admissible under Minnesota's Rules of Evidence. *See State v. Klawitter*, 518 N.W. 2d 577 (Minn. 1994). *Klawitter* does not address—and so far as this Court is aware, it had no reason to consider—the constitutionality of DRE officer trainees providing illegal drugs to citizen recruits for observation and training purposes. *Id.* at 580.

51 at 24. At this early stage of the litigation, the Court agrees that the State Patrol cannot be deemed to be the sole entity that may have failed in its responsibility to properly train the DRE officer trainees.

"A suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent." *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006) (internal citations omitted). Thus, Plaintiffs suit against Jacobson and the two Willers in their official capacities is in fact a suit against Olmsted, Nobles and Hutchinson counties.[10] A municipality, like a county, may be liable under § 1983 where a policy or custom of that entity caused the alleged constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Under certain circumstances, a municipality's failure to adequately train its police officers can be such a policy or custom. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) ("[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.")

To survive a motion to dismiss, Plaintiffs must have pled sufficient facts to show that (1) the counties' officer-training practices were inadequate, (2) the counties were deliberately indifferent to the rights of others in adopting those training practices, (3) the counties' failure to train was a result of deliberate and conscious choices it made and (4) the counties' alleged training deficiencies caused the Plaintiffs' constitutional deprivation. *Ulrich v. Pope County*, 715 F.3d 1054, 1061 (8th Cir. 2013). In the Court's view, any law enforcement officer who provides an illicit drug to citizens recruited from the streets of an urban center for the purpose of observing them while they are

---

[10]
      The same applies to the counties associated with John Doe 1 and 2, assuming the John Doe officer identities will be revealed during discovery.

impaired has not received proper training.

Defendants suggestion that the responsibility for the failure to train, if any, lies with the Minnesota State Patrol is not convincing. The counties sent their officers to the DRE training and, throughout the training process, the officers remained official representatives of the counties they serve. Regardless of whether the State Patrol was responsible for facilitating the DRE program, the counties condoned their officers participation in the program. Even if the counties claim they were unaware of the DRE instruction or tacit approval of the officers providing illicit substances to citizens, the fact that officers allegedly made such provisions to citizens reflects on the counties failure to train. That failure to train led the officers acting with deliberate in difference and, in this case, caused the alleged constitutional deprivations. As such, Olmsted, Nobles, Hutchinson and the two unknown counties associated with John Doe 1 and 2 should not be dismissed from the case.

## IV. CONCLUSION

In sum, Plaintiffs' complaint is flawed in many respects. Many of the deficiencies identified in this report and recommendation can be remedied through a motion to amend the complaint. Nevertheless, for the reasons articulated above, the Court concludes that Plaintiffs Olivier and Bounds have stated sufficient facts to survive the Defendants motions to dismiss their First and Fourteenth Amendment claims against Defendants Jacobson, the two Willers, John Doe 1 and 2 and their associated counties (Olmsted, Nobles, Hutchinson, Unknown County 1 and Unknown County 2).

## V. RECOMMENDATION

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.   Ramsey County's motion to dismiss (ECF No. 32) should be **GRANTED** and the claims should be **DISMISSED WITHOUT PREJUDICE**.

2.      The "City and County" Defendants' motion to dismiss (ECF No. 37) should be **GRANTED in part** and **DENIED in part**, as follows:

    A.      To the extent the motion seeks to dismiss all claims against Officers' Karl Willers and Kenneth Willers in their individual and official capacities, the motion should be **DENIED**.

    B.      In all other respects, the motion should be **GRANTED** and the claims should be **DISMISSED WITHOUT PREJUDICE**.

3.      Anoka County's motion to dismiss (ECF No. 40) should be **GRANTED** and the claims should be **DISMISSED WITHOUT PREJUDICE**.

4.      Dakota County's motion to dismiss (ECF No. 46) should be **GRANTED** and the claims should be **DISMISSED WITHOUT PREJUDICE**.

5.      Olmsted County's motion to dismiss (ECF No. 63) should be **GRANTED in part** and **DENIED in part**, as follows:

    A.      To the extent the motion seeks to dismiss all claims against Officer Jacobson in his individual and official capacity, the motion should be **DENIED**.

    B.      In all other respects, the motion should be **GRANTED** and the claims should be **DISMISSED WITHOUT PREJUDICE**.

6.      Defendants' motions that seek to dismiss all claims against John Does 1-100 and XYZ Entities 1-100 should be **GRANTED in part** and **DENIED in part**, as follows:

    A.      To the extent the motions seek to dismiss all claims against John Does 1-2, the motions should be **DENIED**.

    B.      To the extent the motions seek to dismiss all claims against XYZ Entities 1-2, the motions should be **DENIED**.

    C.      To the extent the motions seek to dismiss all claims against John Does 3-100, the motions should be **GRANTED** and those claims should be **DISMISSED WITHOUT PREJUDICE**.

    B.      To the extent the motions seek to dismiss all claims against XYZ Entities 3-100, the motions should be **GRANTED** and those claims should be **DISMISSED WITHOUT PREJUDICE**.

DATED: February 4, 2014                         *s/Franklin L. Noel*

FRANKLIN L. NOEL
United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **February 18, 2014**, written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **February 18, 2014,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.