IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| MICHAEL BOUNDS, FOREST OLIVIER, ADAM LUGUNA, WIA DAY, DANIEL BELL, and ZACHARY LORENZ,<br><br>Plaintiffs,<br><br>v.<br><br>KARL WILLERS, in his official and individual capacities; CITY OF HUTCHINSON; KENNETH WILLERS, in his official and individual capacities; NOBLES COUNTY; NICHOLAS JACOBSON, in his official and individual capacities; OLMSTED COUNTY; BRYCE SCHUENKE, formerly identified as JOHN DOE #1, in his official and individual capacities; DAKOTA COUNTY; JOHN DOE #2, in his official and individual capacities; PINE COUNTY; CHRIS MCCALL, in his official and individual capacities; ANOKA COUNTY; DANIEL LEWIS, in his official and individual capacities; STEVE SCHULZ, in his official and individual capacities; KANABEC COUNTY; MICHAEL HADLAND, in his official and individual capacities; and FILLMORE COUNTY,<br><br>Defendants. | Docket No. 0:13-cv-00266-JRT-FLN<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT AND JURY TRIAL DEMAND**

Plaintiffs Michael Bounds, Forest Olivier, Adam Luguna, Wia Day, Daniel Bell, and Zachary Lorenz, by and through their counsel, Alan C. Milstein and Michael Dube of Sherman, Silverstein, Kohl, Rose & Podolsky, P.A., and Nathan M. Hansen, by way of Complaint against the Defendants herein, hereby say, state, and aver as follows:

-1-

## THE PARTIES

1. Plaintiffs Michael Bounds, Forest Olivier, Adam Luguna, Wia Day, Daniel Bell, and Zachary Lorenz are adult individuals who are residents of the State of Minnesota.

2. Defendant Karl Willers is a member of the Hutchinson Police Department and an employee of the Hutchinson Police Department and/or Defendant City of Hutchinson. At all relevant times, Mr. Willers was a duly authorized police officer deputized to perform official functions and acting under color of state law. Mr. Willers is being sued in his official and individual capacities.

3. Defendant Kenneth Willers is a member of the Nobles County Sheriff's Office and an employee of the Nobles County Sheriff's Office and/or Defendant Nobles County. At all relevant times, Mr. Willers was a duly authorized police officer deputized to perform official functions and acting under color of state law. Mr. Willers is being sued in his official and individual capacities.

4. Defendant Nicholas Jacobson is a member of the Olmsted County Sheriff's Office and an employee of the Olmsted County Sheriff's Office and/or Defendant Olmsted County. At all relevant times, Mr. Jacobson was a duly authorized police officer deputized to perform official functions and acting under color of state law. Mr. Jacobson is being sued in his official and individual capacities.

5. Defendant Bryce Schuenke (formerly identified as John Doe #1) is a member of the Dakota County Sheriff's Office and an employee of the Dakota County Sheriff's Office and/or Defendant Dakota County. At all relevant times, Mr. Schuenke was a duly authorized police officer deputized to perform official functions and acting under color of state law. Mr. Schuenke is being sued in his official and individual capacities.

6. Defendant John Doe #2 is believed to be an employee of Defendant Pine County but could be employed by another county. At all relevant times, John Doe #2 was a duly authorized police officer deputized to perform official functions and acting under color of state law. John Doe #2 is being sued in his official and individual capacities.

7. Defendant Chris McCall is a member of the Anoka County Sheriff's Office and an employee of the Anoka County Sheriff's Office and/or Defendant Anoka County. At all relevant times, Mr. McCall was a duly authorized police officer deputized to perform official functions and acting under color of state law. Mr. McCall is being sued in his official and individual capacities.

8. Defendants Daniel Lewis and Steve Schulz are members of the Kanabec County Sheriff's Office, and employees of the Kanabec County Sheriff's Office and/or Defendant Kanabec County. At all relevant times, these individuals were duly authorized police officers deputized to perform official functions and acting under color of state law. These individuals are being sued in their official and individual capacities.

9. Defendant Michael Hadland is a member of the Fillmore County Sheriff's Office and an employee of the Fillmore County Sheriff's Office and/or Defendant Fillmore County. At all relevant times, Mr. Hadland was a duly authorized police officer deputized to perform official functions and acting under color of state law. Mr. Hadland is being sued in his official and individual capacities.

## SUBJECT MATTER JURISDICTION

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States," because this civil action arises under the Constitution and laws of the United States.

## FACTS COMMON TO ALL COUNTS

### I.

11. The Defendants individually and collectively designed, developed, and/or ran a program called the "Drug Recognition Evaluators" program ("DRE Program" or "Program").

12. The DRE Program was essentially an unethical clinical trial whereby armed police officers provided vulnerable members of the public with substantial quantities of marijuana (presumably obtained from police evidence in other cases), encouraged them to get high, observed them, and then abandoned them while they were still high.

13. This Program purportedly existed for the purpose of allowing law enforcement to understand what individuals look and act like while high.

14. In actuality, the parties that designed and ran the Program wished to target members of Occupy Minneapolis, members of the homeless population, and other vulnerable members of the population and see what quantity of drugs their bodies could tolerate.

15. Indeed, officers running the Program were instructed to specifically target Occupy Minneapolis protesters exercising their First Amendment right to free speech and peaceable assembly, and in fact targeted such individuals.

16. Officers running the Program were also instructed to specifically target vulnerable members of the population, including homeless individuals and individuals addicted to illegal drugs such as cocaine and heroin, and in fact targeted such individuals.

17. The targeted individuals were taken into police custody, provided with substantial quantities of drugs (principally marijuana) by the police, observed by the police while under the influence of the drugs, and then simply released onto the streets in a high and incoherent state.

18. Any officers who did not actually participate in this aspect of the Program knew about it, and failed to stop it, in reckless disregard of the Plaintiffs' rights.

19. Additionally, the parties that designed and ran the Program authorized providing, and actually provided, cash or other consideration (such as food, cigarettes, and even illegal drugs to take home) to members of the public in exchange for participation, and sometimes intimated to the "volunteers" that they would be arrested if they did not participate.

20. The Plaintiffs and other "participants" were not provided with an informed consent form, nor could any consent have ever been truly voluntary.

21. The Plaintiffs and other "participants" were not asked to supply any medical history.

22. The Defendants' conduct was contrary to (among other things) the Plaintiffs' First Amendment right to free speech and peaceable assembly, the Plaintiffs' Fourteenth Amendment rights to bodily integrity, essential human dignity, and privacy, and other rights secured by the Bill of Rights.

23. The Belmont Report, issued in 1979 by the National Commission for the Protection of Research Subjects in Biomedical and Behavioral Research, sets forth three principles to guide human subject research. It provides that, for human subject research to be ethical, the research must be designed in accordance with "the ethical principles of Respect for Persons, Beneficence and Justice." See http://ohsr.od.nih.gov/guidelines/ (last visited December 16, 2012).

24. The DRE Program was contrary to the principle of Respect for Persons because it treated the human subjects as guinea pigs, if not worse.

25. The DRE Program was contrary to the principle of Beneficence because the risk of injury to human subjects who would be given large quantities of marijuana, observed, and then dropped off in the middle of a major metropolitan area while still in a highly altered state was more than minimal and was outweighed by any possible benefits.

26. The DRE Program was contrary to the principle of Justice because the experiment exclusively targeted those exercising their free speech rights, the economically disadvantaged, and other vulnerable members of the population.

27. In 1991, federal regulations governing human subject research were integrated into the "Common Rule," the most familiar incarnation of which is the Department of Heath and Human Services regulations found at 45 C.F.R. § 46.101, et seq. These federal regulations, among other things, detail the conditions required for obtaining informed consent and what information must be provided under those conditions, restrict experiments to those in which risks are minimized, require the equitable selection of research subjects, and establish the requirement of institutional review boards.

28. The experiment was contrary to the requirements of the Common Rule in virtually every respect.

**II.**

29. Plaintiff Michael Bounds, a member of the Occupy Minneapolis movement, suffers from epilepsy and schizophrenia.

30. On or around April 26, 2012, Mr. Bounds encountered two armed officers participating in the DRE Program, namely Bryce Schuenke of Dakota County[1] and John Doe #2, an unknown officer most likely from Pine County.

31. Mr. Bounds was asked whether he was high; he responded that he was not. One of the officers in turn responded, "That's alright, we'll get you high."

32. Officers then provided him with a substantial quantity of powerful marijuana.

---

[1] Mr. Schuenke was identified John Doe #1 in the Plaintiff's initial Complaint [Docket No. 1].

33. Officers did not conduct any evaluation of him afterwards; rather, he was simply released in downtown Minneapolis while high.

34. Mr. Bounds was also given a quarter of a baggie filled with marijuana to take home in "exchange" for information on the Occupy Minneapolis movement.

35. On three separate occasions on or around April 27, 2012, Plaintiff Forest Olivier, also an Occupy member, was approached by armed law enforcement (including Chris McCall, Bryce Schuenke, Karl Willers or Kenneth Willers, Daniel Lewis or Steve Schulz, Nicholas Jacobson, and Michael Hadland) and offered substantial quantities of drugs.

36. On the first occasion, Mr. Olivier was approached by Chris McCall of Anoka County and Bryce Schuenke of Dakota County.  Mr. Olivier was given eight pipe bowls worth of marijuana, taken to a testing facility to be evaluated, evaluated there, and then returned to Peavey Plaza, where the Occupy protesters were gathered.

37. On the second occasion, Mr. Olivier was approached by either Karl Willers of the City of Hutchinson or Kenneth Willers of Nobles County, either Daniel Lewis or Steve Schulz of Kanabec County, and Nicholas Jacobson of Olmsted County, given ten or more pipe bowls worth of marijuana, taken to the facility to be evaluated, and then returned to Peavey Plaza.

38. On the third occasion, Mr. Olivier was approached by Nicholas Jacobson of Olmsted County and Michael Hadland of Fillmore County.

39. These officers asked Mr. Olivier whether he was in possession of any marijuana, to which Mr. Olivier responded no.

40. Thereafter, these officers placed Mr. Olivier in the back of a squad car, and placed his personal belongings in the trunk of the vehicle.

41. One of these officers then provided Mr. Olivier with a substantial quantity of marijuana, which Mr. Olivier smoked in the back of the squad car.

42. Thereafter, Mr. Olivier was taken to the testing facility, at which point other law enforcement officials refused to let Mr. Olivier in because they identified him as being associated with Occupy Minneapolis, and were wary of footage of the Program that Occupy Minneapolis had posted on YouTube.

43. Thereafter, Mr. Olivier was taken back downtown and released onto the streets while incredibly high.

44. Plaintiff Adam Luguna was picked up by Officers Schuenke and Hadland, taken out to the examination facility roughly twenty minutes away, provided with marijuana, subsequently examined by an unidentified police officer, and released while high.

45. Plaintiff Wia Day was picked up by Officers Lewis and Schulz and brought out to the testing facility. At that point, Officers Lewis and Schulz provided Ms. Day with marijuana, which Ms. Day smoked, and brought Ms. Day in for testing.

46. Plaintiffs Daniel Bell and Zachary Lorenz, who are step-brothers, were also picked up by Officers Lewis and Schulz and brought out to the same testing facility. At that point, Officers Lewis and Schulz provided Messrs. Bell and Lorenz with marijuana, which Messrs. Bell and Lorenz smoked, and brought Messrs. Bell and Lorenz in for testing.

47. Officers Lewis and Schulz then gave Messrs. Bell and Lorenz two or three grams of extremely powerful marijuana to take with them.

48. Mr. Lorenz was determined to be incompetent when he was eighteen or nineteen years old.

49. The Defendants' unethical and illegal conduct was first brought to light by Occupy Minneapolis; in response, officers falsely denied the allegations and attempted to cast doubts upon the truthfulness of the Occupy members.

50. Thereafter, certain officers participating in the program (such as Deputy Andrew James Mahowald of the Chisago County Sheriff's Office) began making the same allegations, which triggered an investigation by the Minnesota Bureau of Criminal Apprehension ("Bureau").

51. Indeed, Officer Mahowald personally witnessed Mr. Olivier being provided drugs by an Officer Willers, and provided details to the Bureau during the investigation.

52. Tellingly, six police officers (including but not limited to Officer Karl Willers and Officer Schuenke) refused to provide statements to the Bureau.

53. During the investigation, one officer testified as to his belief that instructors "skirted the line" in connection with the Program, while another testified that "morals are gone."

54. On August 7, 2013, the *Star Tribune* reported that Karl Willers "admitted to superiors last fall that he gave people marijuana as part of a state training exercise in Minneapolis."

55. The paper further reported that "Karl Willers[] also told his department that between 30 and 40 percent of his training class distributed narcotics in order to perform observations … ."

56. After these abuses came to light, the DRE Program was suspended.

57. As a result of the Defendants' individual and collective wrongdoing, the Plaintiffs have suffered physical and emotional damages and harm, and been deprived of their well-established rights under the United States Constitution and federal law.

**COUNT ONE – LIABILITY UNDER 42 U.S.C. §§ 1983 AND 1988**

58. The Plaintiffs repeat the foregoing allegations as if fully set forth herein.

59. 42 U.S.C. § 1983 provides, in pertinent part, as follows: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or

other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress."

60.     The Defendants are all "persons" within the ambit of 42 U.S.C. § 1983.

61.     The Defendants acted "under color of" state law because they exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." See West v. Atkins, 487 U.S. 42, 49 (1988) (quoting United States v. Classic, 313 U.S. 299, 326 (1941).  Indeed, it could not be more well-established that police officers act under color of state law.  See Monroe v. Pape, 365 U.S. 167, 172 (1961).  Moreover, the Defendants acted within the actual and apparent scope of their authority and office.

62.     Furthermore, the police officers were acting in accordance within the official policy and custom of the Defendant counties and municipalities, including but not limited to their employers' negligent training or failure to train about (1) providing illegal drugs to members of the public, (2) experimenting upon the public, (3) targeting individuals exercising First Amendment rights, and (4) reporting misconduct by fellow police officers.

63.     There was a direct and proximate causal connection between the Defendants' wrongful conduct and the harm and damages that resulted.

64.     The Defendants' conduct deprived the Plaintiffs of their rights under the First and Fourteenth Amendments to the United States Constitution, and other rights secured by the Bill of Rights, as well as other federally secured rights, and failed to protect the Plaintiffs from injury.

65.     The Defendants' conduct was "arbitrary, or conscience shocking, in a constitutional sense." See Board of Regents v. Tomanio, 446 U.S. 478 (1980).

66.     Indeed, the Defendants' conduct "clearly established statutory or constitutional rights of which a reasonable person would have known."    Harlow v. Fitzgerald, 457 U.S. 800

(1982).  A version of the DRE Program exists in other states, and, on information and belief, there has been no other situation in which police officers actually offered illegal drugs to members of the public.

67.	The Defendants acted with deliberate indifference towards the Plaintiffs' medical needs, recklessly disregarded their rights, and acted with an improper motivation.

68.	The Defendants had no legitimate, much less compelling, reason to perform an experiment of the nature described herein upon members of Occupy Minneapolis, Minneapolis' poor population, or anyone at all.

69.	The Plaintiffs seek from the Defendants all legally recoverable damages, including but not limited to compensatory and punitive damages, and dignity damages, as well as their attorney's fees, litigation expenses, and court costs.  See 42 U.S.C. § 1983; accord id. § 1988.

**WHEREFORE**, the Plaintiffs demand a judgment in their favor, and against the Defendants, in an amount exceeding $1,000,000, compensatory damages, punitive damages, dignity damages, attorney's fees, litigation expenses, and court costs.

### DEMAND FOR JURY TRIAL

The Plaintiffs hereby demand a trial by twelve (12) jurors as to all counts and causes of action.

Dated: Monday, May 19, 2014	Respectfully submitted,

LAW OFFICES OF NATHAN M. HANSEN

By:	/s/ Nathan M. Hansen
Nathan M. Hansen
2440 North Charles Street, Suite 242
North St. Paul, MN 55109
Telephone: 651-704-9600
Facsimile: 651-704-9604
E-Mail: nathan@hansenlawoffice.com

*- and -*

SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.

By: Alan C. Milstein (*Pro Hac Vice*)
Michael Dube (*Pro Hac Vice*)
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: 856-662-0700
Facsimile: 856-488-4744
E-Mail: amilstein@shermansilverstein.com

*Attorneys for the Plaintiffs*

-12-