UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Michael Bounds et al.,                                      Civil No. 13-266 (JRT/FLN)

                    Plaintiffs,

        v.                                        **REPORT AND
                                                   RECOMMENDATION**

Karl Willers et al.,

                    Defendants.
_____

Alan Milstein and Nathan Hansen for Plaintiffs.
Stephanie Angolkar for the "City and County" Defendants.
John Baker and Janine Wetzel Kimble for Defendants Olmsted County and Nicholas Jacobson.
Helen Brosnahan for Defendants Dakota County and Bryce Schuenke.
_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on October 23, 2015 on Defendants' three separate motions for summary judgment (ECF Nos. 147, 153, and 161). This matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. Order, ECF No. 177. For the reasons that follow, the Court recommends that Defendants' motions be **GRANTED in part** and **DENIED in part**.

## I. INTRODUCTION

This lawsuit challenges the actions of numerous law enforcement officers and municipalities involved with Minnesota's Drug Recognition Evaluator ("DRE") program. Several individuals involved in the Occupy Minneapolis protests claim that certain DRE officer trainees provided them with substantial quantities of illicit drugs and evaluated them as test subjects for the DRE program. This, Plaintiffs argue, violated their rights protected by the First and Fourteenth Amendments of the U.S. Constitution. Plaintiffs also allege that the municipal entities employing the offending officers failed to train them properly. All Defendants have now filed motions for summary judgment.

## II. FACTUAL BACKGROUND

**A.**    **The Drug Recognition Evaluator program**

The DRE program prepares police officers and other qualified persons to serve as drug recognition experts. Baker Aff. Ex. 19, ECF No. 156. A drug recognition expert is an individual who is specially trained to conduct examinations of drug-impaired drivers. *Id.*

A drug recognition examination typically includes the following:

- a breath test to determine blood alcohol concentration;

- preliminary assessments of the subject's speech, breath, appearance, demeanor, behavior, etc.;

- examinations of the subject's eyes (for nystagmus, tracking ability, ability to converge, pupil size, and pupil reaction to light);

- psychophysical evaluations of the subject, based on divided attention tests;

- examinations of the subject's vital signs (e.g., blood pressure, pulse rate, and temperature);

- inspections of the subject's arms, neck, nasal area, oral cavity, etc. for signs of drug ingestion.

*Id.* Based on this examination, a trained drug recognition expert is presumably able to reach "reasonably accurate conclusions concerning the category or categories of drugs, or medical conditions, causing the impairment observed in the subject." *Id.*

**B.**    **The 2012 Minnesota DRE program**

Since at least 2005, the Minnesota State Patrol has facilitated the DRE program in Minnesota. Munoz Dep. 72:10–17, ECF No. 156, Ex. 20. The present action arises from actions taken by the Defendants pursuant to the 2012 DRE program. The 2012 DRE program consisted of two parts. The first was a two-week classroom component where the officers were instructed on how

to determine whether an individual was under the influence of a controlled substance. *Id.* at 14:20–21, 18:15–22. Effects from drugs such as marijuana, inhalants, dissociative anesthetics, stimulants, depressants, and antidepressants were discussed during the classroom training. *Id.* at 18:25–21:7. At the end of the in-class instruction, the officers in the program were required to pass a written test on the information they had learned. *Id.* at 21:8–18.

During the second part of the DRE program, officers were placed into two-person groups and were required to conduct between 12 and 15 field examinations. *Id.* at 21:22–22:1. Richard Munoz, a former Minnesota State Patrol Sergeant, was the lead instructor for the 2012 DRE program. *Id.* at 5:7–23. According to Munoz, officers were instructed to go to areas where drug use was prevalent and search for individuals who appeared to be under the influence. *Id.* at 25:1–29:7. Officers were told to approach these individuals, explain the DRE program, and ask if they wanted to volunteer and help officers learn how to identify the physical side effects of drugs. *Id.* at 35:4–10. If the individual agreed to be evaluated for the program, he or she was brought to a separate facility for the field examination.

The DRE program used a Minnesota Department of Transportation ("DOT") building near the Minneapolis-St. Paul airport for officers to conduct their field examinations. *Id.* at 23:9–11. Once at the DOT building, the officers completed a drug influence evaluation form, where they recorded their observations of the subject's physical appearance (e.g., eyes, pupil size, etc.) as well as his ability to balance with his eyes closed, conduct a walk and turn test, and stand on one leg. *See* ECF No. 20, Ex. 23. Munoz stated that 75% of the subjects also provided urine samples. Munoz Dep. 41:7–15. Officers had to accurately identify the correct intoxicant in 75% of the subjects they examined in order to pass the second part of the program. *Id.* at 42:24–43:23. All of the evaluations

were witnessed and supervised by a DRE instructor. *Id.* at 44:9–12. Once a volunteer's evaluation was complete, many of the officers provided the individual with food, cigarettes, or money as remuneration for participating in the program. *Id.* at 61:11–62:6.

## C.     The present litigation

On February 1, 2013, Plaintiffs Michael Bounds,[1] Forest Olivier, Adam Luguna, Wia Day, Daniel Bell, and Zachary Lorenz filed a 42 U.S.C. § 1983 action against a multitude of law enforcement officers and municipalities, alleging that the officers who participated in the 2012 DRE program were instructed to target and recruit specific segments of the Minneapolis population, including the homeless and those who were involved in the Occupy Minneapolis protests. *See generally* Compl., ECF No. 1; *see also* Am. Compl., ECF No. 108. Rather than simply recruiting those who were already impaired, Plaintiffs allege that the DRE officers were instructed to provide the recruits with illicit drugs to ingest. ECF No. 108 ¶ 12, 17. After the DRE officers conducted their field examination, Plaintiffs claim that they dropped the volunteers off in downtown Minneapolis in a "high and incoherent state." *Id.* ¶ 17. Other Plaintiffs allege that they were given cash or other consideration (including illegal drugs) for their participation and/or in exchange for information about the Occupy Minneapolis movement. *Id.* ¶ 19. Finally, Plaintiffs allege that the DRE officer trainees intimated to the recruits that they would be arrested if they did not agree to participate in the program. *Id.* These actions, Plaintiffs claim, deprived them of their rights protected by the First and Fourteenth Amendments to the U.S. Constitution. *Id.* ¶ 64.

In response to the Complaint, all Defendants filed various motions to dismiss. *See* ECF Nos.

---

[1]     Michael Bounds voluntarily dismissed his claims with prejudice on October 23, 2014. *See* ECF Nos. 116 and 117.

4

32, 37, 40, 46, and 63. In an Order dated March 31, 2014, the Court granted in part and denied in part Defendants' motions, dismissing many Defendants without prejudice. Mem. Op. & Order, ECF No. 86. The Court did, however, conclude that some Plaintiffs alleged sufficient facts to survive a motion to dismiss. *Id.* Following this Order, the Court allowed Plaintiffs to amend their Complaint to remedy the deficiencies highlighted by the Court. Order, ECF No. 106. Plaintiffs' Amended Complaint added additional factual allegations and named the following law enforcement officers, as well as their corresponding municipal employers (named in parenthesis), as Defendants: Karl Willers (City of Hutchinson), Kenneth Willers (Nobles County), Nicholas Jacobson (Olmsted County), Bryce Schuenke (Dakota County), John Doe #2 (Pine County), Daniel Lewis (Kanabec County), Steve Schulz (Kanabec County), and Michael Hadland (Fillmore County).[2] ECF No. 108. All officers are alleged to have participated in the 2012 DRE program and are sued in both their individual and official capacities.

**D.     Specific claims by Plaintiffs**

Plaintiff Forest Olivier was a member of the Occupy Minneapolis movement. ECF No. 108 ¶ 35. Olivier claims that he was approached by DRE officers on three separate occasions on or around April 27, 2012. *Id.* On each occasion, he alleges that he was given a substantial quantity of marijuana and brought to the DRE testing facility for an evaluation. *Id.* ¶¶ 36–42.

Plaintiff Adam Luguna was also a member of the Occupy Minneapolis movement. Luguna alleges that he was picked up by Defendants Schuenke and Hadland, taken to the DRE testing facility, provided with marijuana, and then examined by officers. *Id.* ¶ 44. Following the evaluation,

---

[2]    Chris McCall and Anoka County were also named as Defendants. *See* ECF No. 108. These Defendants were dismissed with prejudice on December 2, 2014 pursuant to a stipulation between the parties. Order, ECF No. 120.

Luguna claims he was released while he was still under the influence of marijuana. *Id.*

Plaintiff Wia Day claims that she was picked up by Defendants Lewis and Schulz, brought to the testing facility, given marijuana, and then evaluated. *Id.* ¶ 45.

Plaintiffs Daniel Bell and Zachary Lorenz are step-brothers and allege that they were also picked up by Defendants Lewis and Schulz, provided with marijuana, and brought to the DRE facility for an evaluation. *Id.* ¶ 46. Bell and Lorenz claim that they were given two or three grams of "extremely powerful marijuana" to take with them after the evaluation. *Id.* ¶ 47.

**E.     Minnesota Bureau of Criminal Apprehension investigation**

After many of the allegations included in Plaintiffs' Amended Complaint were made public, Minnesota's DRE program was suspended. Plaintiffs allege that some of the DRE officers falsely denied the public allegations made by the examinees. *Id.* ¶ 49. At least one DRE officer from Chisago County, however, reported allegations to his supervisor that certain officers provided illicit drugs to the volunteers. *Id.* ¶ 50. Indeed, at least one of the named Defendants in this case admitted that the only way to get volunteers for evaluations was by providing the volunteers with drugs. *See, e.g.*, Karl Willers Dep. 10:3–5, ECF No. 149-8. The public controversy surrounding the DRE program prompted an investigation by the Minnesota Bureau of Criminal Apprehension. *Id.*; ECF No. 49. Upon completion of the investigation, however, it was recommended that no criminal charges be filed against any of the DRE officer trainees. *See* ECF No. 49.

**F.     The present motions for summary judgment**

Various groups of Defendants are represented by separate attorneys. The groups of Defendants are as follows: (1) Defendants Karl Willers, City of Hutchinson, Kenneth Willers, Nobles County, Pine County, Daniel Lewis, Steve Schulz, Kanabec County, Michael Hadland, and

Fillmore County ("City and County Defendants"); (2) Defendants Nicholas Jacobson and Olmsted County ("Olmsted County Defendants"); and (3) Defendants Bryce Schuenke and Dakota County ("Dakota County Defendants"). Each group of Defendants has filed its own motion for summary judgment. *See* ECF Nos. 147, 153, and 161. Plaintiff opposes all three motions. *See* Pls.' Omnibus Opp'n Mem., ECF No. 166.

## II. STANDARD OF REVIEW

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Larson*, 327 F.3d 762, 767 (8th Cir. 2003). A disputed fact is material only if it might affect the outcome of the case under the governing substantive law, and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Khoury v. Grp. Health Plan, Inc.*, 615 F.3d 946, 952 (8th Cir. 2010).

## III. CONCLUSIONS OF LAW

### A.    Plaintiffs' First Amendment claims

At the time of the 2012 DRE program, members of Occupy Minneapolis were exercising their First Amendment freedoms of speech and assembly at Peavey Plaza in Minneapolis. Plaintiffs' Amended Complaint alleges that the Defendant law enforcement officers specifically targeted members of Occupy Minneapolis to participate as observation subjects for the DRE program. ECF No. 108 ¶¶ 14, 15, 64. This targeting, Plaintiffs' allege, violated their rights protected by the First

Amendment.

"A citizen's right to exercise First Amendment freedoms 'without facing retaliation from government officials is clearly established.'" *Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th Cir. 2010) (citing *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007)). To prevail on a § 1983 claim for retaliation in violation of the First Amendment, a plaintiff "must demonstrate (1) that he engaged in a protected activity; (2) that the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity; and (3) that the adverse action was motivated at least in part by the exercise of the protected activity." *Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013). In other words, Plaintiffs must show a causal connection between a defendant's retaliatory animus and Plaintiffs' subsequent injury. *Osborne v. Grussing*, 477 F.3d 1002, 1005 (8th Cir. 2007). "Retaliation need not have been the sole motive, but it must have been a 'substantial factor' in those decisions." *Kilpatrick*, 499 F.3d at 767. Plaintiffs must also show "that the retaliatory motive was a but-for cause of the harm; that is, that the plaintiff was 'singled out' for adverse treatment because of his exercise of constitutional rights." *Id.* (citing *Osborne*, 477 F.3d at 1006).

After reviewing the entire record, the Court concludes that Plaintiffs have failed to put forth any evidence that any Defendant's decision to approach an individual at Peavey Plaza was motivated by the individual's participation in the Occupy Minneapolis protests. Plaintiffs cite no evidence that the reason any Defendant approached a named Plaintiff was because the Plaintiff was exercising his or her First Amendment rights. Rather, the evidence in the record simply indicates that the reason most Defendants approached individuals in Peavey Plaza was because they knew that there were a multitude of individuals in that area who were under the influence of controlled substances. Any

allegations by Plaintiffs to the contrary is merely speculative.

The Court observes the following specific evidence in the record with respect to each individual Defendant regarding his interactions with individuals at Peavey Plaza:

### 1. Steve Schulz

Schulz testified at his deposition that he never participated in the 2012 DRE program. Schulz Dep. 5:16–20, ECF No. 149-6.

### 2. Daniel Lewis

Lewis testified at his deposition that during his one trip to Peavey Plaza to drop some volunteers off, another volunteer got in his car and returned with him to the evaluation facility. Lewis Dep. 55:25–56:18, ECF No. 149-7. This person was acquainted with the participants Lewis had dropped off. *Id.* at 56:15–18. Nothing in Lewis's deposition suggests that the reason he chose this particular volunteer was because he or she was exercising his or her First Amendment rights.

Olivier and Day are the only Plaintiffs who claim to have interacted with Lewis. *See* ECF No. 108 at ¶¶ 37, 45. Nothing in either Olivier's or Day's deposition testimony suggests that Lewis targeted them because they were protesting. *See generally* Olivier Dep., ECF No. 149-2; Day Dep., ECF No. 149-1.

### 3. Karl Willers

During his deposition, Karl Willers stated that other DRE officers in the program informed him that good candidates for evaluation were at the Occupy Minneapolis location. Willers Dep. 12:4–12, ECF No. 149-8. He stated that "most of the people that were there, or in that area, were homeless and the majority of them were drug users, addicted to drugs. Obviously the type of people that we would like to try to talk to." *Id.* at 13:4–7. Nothing in Willers's deposition testimony,

however, suggests that the reason he chose to look for volunteers at Peavey Plaza was because they were protesting or exercising their First Amendment rights.

Olivier is the only Plaintiff who alleges an interaction with Willers. *See* ECF No. 108 at ¶¶ 35–37. Nothing in Olivier's deposition testimony suggests that Willers targeted him because he was protesting. *See generally* ECF No. 149-2.

### 4. Michael Hadland

In his deposition, Hadland stated that he was not familiar with the Minneapolis-St. Paul area, so his DRE program partner, Defendant Schuenke, chose the locations to search for evaluation subjects. Hadland Dep. 18:7–15, ECF No. 149-9. Nothing in Hadland's deposition remotely suggests that he purposely targeted individuals at Peavey Plaza because they were participating in the Occupy Minneapolis protests.

Luguna and Olivier are the only Plaintiffs who allege that they interacted with Hadland. Nothing in either Luguna's or Olivier's deposition suggests that Hadland targeted them because they were protesting. *See generally* Luguna Dep., ECF No. 149-5; ECF No. 149-2.

### 5. Kenneth Willers

Kenneth Willers stated in his deposition that he only went to the Peavey Plaza area on one occasion. Willers Dep. 20:10–15, ECF No. 149-10. According to Willers, he went to this area simply to see what was happening at the protest. *Id.* at 20:18–20. He had seen newscasts covering the protests, and he was interested to see what everyone was talking about. *Id.* at 20:18–24. Willers stated that he had completed all of his required evaluations by the time he visited Peavey Plaza. *Id.* at 20:13. Nothing in his deposition supports Plaintiffs' assertion that the DRE officers were targeting Occupy Minneapolis protesters because they were exercising their First Amendment rights.

Olivier is the only Plaintiff who alleges that he interacted with Willers. Nothing in Olivier's deposition suggests that he was targeted by Willers because he was protesting. *See generally* ECF No. 149-2.

### 6.    Bryce Schuenke

While Schuenke admitted that he observed individuals in the Peavey Plaza area, *see* Schuenke Dep. 16:16–18, ECF No. 149-17, there is nothing in his deposition testimony to suggest that the reason he was in the Peavey Plaza area was because of the Occupy Minneapolis protesters.

Luguna and Olivier are the only two Plaintiffs who allege that they interacted with Schuenke. Nothing in either Luguna's or Olivier's deposition suggests that Schuenke targeted them because they were protesting. *See generally* ECF Nos. 149-2; 149-5.

### 7.    Nicholas Jacobson

Jacobson admitted that he focused on Peavey Plaza when he was looking for subjects to examine. There is nothing in his deposition testimony, however, that suggests his purpose for focusing on Peavey Plaza was to retaliate against the Occupy Minneapolis protesters for exercising their First Amendment rights. *See generally* Jacobson Dep. 13–20, ECF No. 156, Ex. 22.

Olivier was the only Plaintiff who alleged that he interacted with Jacobson. Nothing in his deposition suggests that Jacobson targeted him because he was protesting at Peavey Plaza. *See generally* ECF No. 149-2.

Based upon the foregoing, it is clear that there is no evidence in the record that any Defendant approached any Plaintiff to participate in as a DRE examination because he or she was part of Occupy Minneapolis. Indeed, at least one Plaintiff admits that he was not even part of Occupy Minneapolis. *See* Bell Dep. 7:8–12. Plaintiffs do not reference any evidence in the record

that suggests Defendants desired to retaliate against Plaintiffs for exercising their First Amendment rights. "To survive a motion for summary judgment, the nonmoving party must 'substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy.'" *Putman v. Unity Health Sys.*, 348 F.3d 732, 733–34 (8th Cir. 2003) (quoting *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995)). "A party asserting that a fact . . . is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). The Court concludes that no genuine issue of material fact exists as to Plaintiffs' § 1983 claim that Defendants retaliated against them for exercising their First Amendment rights. Summary judgment must be granted in favor of Defendants on all Plaintiffs' First Amendment claims.

**B.     Plaintiffs' Fourteenth Amendment claims**

Plaintiffs claim that Defendants actions during the 2012 DRE program violated their substantive due process right to bodily integrity protected by the Fourteenth Amendment. *See* ECF No. 108 at ¶ 64; *see also* ECF No. 106 at 21 (arguing why Plaintiffs' substantive due process claim should survive summary judgment).

The Due Process Clause of the Fourteenth Amendment states that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV. "[T]he theory of substantive due process is properly reserved for truly egregious and extraordinary cases." *Myers v. Scott Cnty.*, 868 F.2d 1017, 1018 (8th Cir. 1989). "To recover for a deprivation of substantive due process, a 'plaintiff must demonstrate *both* that the official's conduct was

conscience-shocking, *and* that the official violated one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Lawrence v. City of St. Paul*, 740 F. Supp. 2d 1026, 1037 (D. Minn. 2010) (quoting *Slusarchuk v. Hoff*, 346 F.3d 1178, 1181–82 (8th Cir. 2003) (emphasis in original)).

Substantive due process protections generally pertain to issues relating to marriage, family, procreation, and the right to bodily integrity. *Albright v. Oliver*, 510 U.S. 266, 272 (1994) (citing *Planned Parenthood v. Casey*, 505 U.S. 833, 847–49 (1992)). "The integrity of the individual person is a cherished value of our society." *Schmerber v. California*, 384 U.S. 757, 772 (1966); *see also In re Cincinnati Radiation Litig.*, 874 F. Supp. 796, 810–11 (S.D. Ohio 1995) ("The right to be free of state-sponsored invasion of a person's bodily integrity is protected by the Fourteenth Amendment guarantee of due process.").

Defendants argue that in cases where individuals consent or volunteer for certain medical procedures, they cannot thereafter claim that their Fourteenth Amendment right to substantive due process is violated. *See* ECF No. 150 at 16–17 (citing *Villanueva v. City of Scotsbluff*, 779 F.3d 507, 513 (8th Cir. 2015)); ECF No. 155 at 25–28 (citing *Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 795 (8th Cir. 1998)); ECF No. 163 at 22. In response, Plaintiffs assert that any consent that may have been given was vitiated by the unconscionable nature of the officers' actions. ECF No. 166 at 25.

After reviewing the relevant case law, the Court concludes that the first question that must be addressed is whether Plaintiffs' participation as examinees in the DRE program was voluntary or coerced. In every relevant case cited by the parties, the question of voluntariness is a core issue

that the courts have addressed when deciding whether a plaintiff's substantive due process rights were violated.

For example, in *In re Cincinnati Radiation Litigation*, one of the primary cases relied on by Plaintiffs, the court addressed a motion to dismiss claims for violation of bodily integrity by terminal cancer patients upon whom the military conducted experiments to test the effects of massive radiation exposure on humans. 874 F. Supp. at 800–01. The court held that although the plaintiffs were technically voluntarily present at the hospital and free to leave at any time, questions remained as to whether the plaintiffs' consent was in fact voluntary given: (1) many of the plaintiffs were poor and discovery could show that the relevant hospital was the only affordable option; (2) plaintiffs allegation that they were misled about the purpose of the experiments and possible side effects; and (3) plaintiffs did not know they could end the experiments at any time. *See id.* at 811–12. Because discovery was necessary to investigate this issue of voluntariness, the court denied the defendants' motion to dismiss.

Similarly, the plaintiffs in *Heinrich v. Sweet* alleged they were subjected to experiments while under the care of Massachusetts General Hospital and Brookhaven National Laboratory. 62 F. Supp. 2d 282, 290 (D. Mass. 1999). According to the plaintiffs, they were misled regarding the nature of the treatments they were given in order to secure their participation in experimental trials, and they were subjected to radiation for purposes unrelated to any possible therapeutic benefit. *Id.* at 313. The court observed that the defendant's failure to disclose the true nature of the experiments vitiated any consent that may have been given, thereby rendering the experiments similar to forced, involuntary invasions of bodily integrity. *Id.*

Finally, relatives of the plaintiffs in *Wright v. Fred Hutchinson Cancer Research Center*

14

volunteered for experimental medical treatment, and the plaintiffs brought claims against the hospital for failing to provide adequate information regarding the risks of the treatment and for failing to comply with national standards for human subjects' experiments. 269 F. Supp. 2d 1286, 1291, 1294 (W.D. Wash. 2002). Concluding that the true nature of the experiments were not hidden from the plaintiffs' relatives and the proposed treatment regimen was believed to be of benefit to the participants, the court held that the plaintiffs could not satisfy the requirements for a substantive due process claim. *Id.* at 1295–96. The court stated, "Knowledge that one is participating in a human subjects experiment, whether therapeutic or not, is a 'crucial' factor in determining whether a constitutional right is at stake." *Id.* at 1296.

While it does not appear that the Eighth Circuit has specifically addressed one's substantive due process right to bodily integrity in the context of medical experiments, it has addressed such claims in cases where law enforcement officers were accused of sexual misconduct. For example, in *Rogers v. City of Little Rock, Ark.*, the court held that a police officer's nonconsensual intercourse with the plaintiff violated her substantive due process right to bodily integrity. 152 F.3d 790, 797 (8th Cir. 1998) (stating that the defendant's "contention that no due process violation can be established on these facts therefore fails unless the district court's factual finding that the sex was nonconsensual was clear error"). Recently, the Eighth Circuit distinguished *Rogers* in *Villanueva v. City of Scottsbluff*, 779 F.3d 507 (8th Cir. 2015). In *Villanueva*, the court held that although the plaintiff claimed she was enticed into a sexual relationship with the defendant police officer, the evidence did not "suggest [the defendant] coerced [the plaintiff] into sexual relations through an abuse of his authority so egregious and outrageous that it shocks the conscience." *Id.* at 514. Specifically, the Eighth Circuit stated that the defendant's conduct could not be likened to the rape

perpetrated in *Rogers* and therefore the actions of the officer did not rise to a violation of the plaintiff's substantive due process rights. *Id.*

The common denominator between these bodily integrity cases is the concept of voluntariness and/or coercion. This Court acknowledged as much in its March 31, 2014 Order denying Defendants' motion to dismiss Plaintiffs' Fourteenth Amendment claims:

> Plaintiffs adequately allege that their participation was not, in fact, voluntary, but rather that officers operating the DRE program "sometimes intimated to the 'volunteers' that they would be arrested if they did not participate." (Compl. ¶ 17.) Plaintiffs' allegations amount to claims that Defendants, under threat of arrest and not for any therapeutic purpose, administered "substantial quantit[ies] of a "powerful" drug that is illegal under state and federal law to Plaintiffs without providing Plaintiffs any information about the risks involved and without first checking Plaintiffs' medical histories, and then dropped Plaintiffs off in downtown Minneapolis without continued supervision.
>
> These allegations suffice, at this stage, to state a claim for violation of bodily integrity. . . .

ECF No. 86 at 20. Because a court need only determine whether a complaint states a claim to relief that is "plausible on its face" at the motion to dismiss stage, the Court denied Defendants' motions to dismiss given that the Complaint alleged that Plaintiffs' participation as subjects in the DRE program was coerced or involuntary. This case, however, is now at the motion for summary judgment stage. Plaintiffs must do more than simply allege a plausible claim for relief. Rather, Plaintiffs must "present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial." *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002).

Because the conduct of each Defendant must be independently analyzed at the summary judgment stage, the Court will address the evidence, or lack of evidence, in the record against each individual Defendant. *See Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006) ("Liability for

damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed.").

### 1.    Forest Olivier's claims

According to the Amended Complaint, Olivier had three interactions with law enforcement officers conducting examinations as part of the DRE program, more than any other of the named Plaintiffs. On the first occasion, Olivier claims he was approached by Chris McCall of Anoka County and Bryce Schuenke of Dakota County. ECF No. 108 at ¶ 36. He states that these officers gave him eight pipe bowls worth of marijuana, took him to the DRE facility for an evaluation, and then returned him to Peavey Plaza. *Id.* On the second occasion, Olivier alleges that he was approached by "either Karl Willers of the City of Hutchinson or Kenneth Willers of Nobles County, either Daniel Lewis or Steve Schulz of Kanabec County, and Nicholas Jacobson of Olmsted County." *Id.* ¶ 37. He states that these officers gave him ten or more pipe bowls of marijuana, took him to the DRE facility for an evaluation, and then returned him to Peavey Plaza. *Id.* Finally, on the third occasion, Olivier states that he was approached by Nicholas Jacobson of Olmsted County and Michael Hadland of Fillmore County. *Id.* ¶ 38. These officers, according to Olivier, provided him with a substantial quantity of marijuana and took him to the DRE facility for evaluation. *Id.* ¶¶ 41–42. Olivier states that he was turned away on this occasion because he was associated with Occupy Minneapolis. *Id.* ¶ 42.

Olivier's deposition testimony, however, seems to contradict the details alleged in the Amended Complaint. *See generally* Olivier Dep., ECF No. 149-2. Indeed, Olivier contradicted himself numerous times throughout the duration of his deposition. *See id.* By the end of the deposition, Olivier's testimony was that he had four total interactions with DRE officers. *See* Olivier

Dep. Ex. 6, *attached to* ECF No. 156, Ex. 47. According to Olivier, during his first interaction with DRE officers, he was picked up by "Nick and his deputy." *Id.* During this incident, he was accompanied by Plaintiffs Zachary Lorenz and Daniel Bell. *Id.* Although he could not remember the officers' specific names, he claims that he was transported in a Kanabec County squad car.[3] *Id.* This, however, is inconsistent with his Amended Complaint, which alleges that he was transported by Officer McCall of Anoka County and Officer Schuenke of Dakota County during his first interaction with the DRE program. *Compare id. with* ECF No. 108 ¶ 36.

Olivier testified that his second incident with the DRE program involved two unknown officers that were traveling in a Dakota County squad car. Olivier Dep. Ex. 6. Olivier admitted that he could not remember these officers' names. This contradicts his Amended Complaint, which does not outline any incident with Dakota County officers apart from his first interaction with the DRE program. *Compare id. with* ECF No. 108 ¶¶ 36–43.

During the third incident Olivier described during his deposition, Olivier claims he was with his friend Jay. Olivier Dep. Ex. 6. Again, Olivier could not remember the names of the officers who transported him to the DRE facility; he only recalled that he was transported by someone from Hutchinson County. *Id.* The Amended Complaint does allege that Karl Willers of Hutchinson County was one of the officers with whom he interacted during one of his encounters with DRE officers. However, this interaction, according to the Amended Complaint, occurred on the "second occasion," not the third occasion. *Compare id. with* ECF No. 108 ¶ 37.

---

[3]     Nicholas Jacobson—the only defendant named "Nick"—does not work for Kanabec County. Jacobson also stated that he was partnered with Minnesota State Trooper John Schmutzer. Jacobson Dep. 10:3. The officers from Kanabec County that are Defendants in this case are Daniel Lewis and Steve Schulz.

Finally, Olivier claimed during his deposition that he had a fourth interaction with the DRE program, where he was again with his friend Jay. Olivier Dep. Ex. 6. During this incident, he was driven to the testing facility by "Nick and his deputies." *Id.* He also stated that someone from Chisago County was present. *Id.* Again, this testimony is only partially consistent with his Amended Complaint. Although he testified that his final interaction with the DRE program involved Nicholas Jacobson (presumably the "Nick" referred to by Olivier), the Amended Complaint alleges that this incident also involved Michael Hadland of Fillmore County. *Compare id. with* ECF No. 108 at ¶ 38. Nothing in his Amended Complaint suggests that his final interaction involved anyone from Chisago County. *See generally* ECF No. 108.

Olivier's claims become even more muddled when the Court considers the arguments made by counsel in its memorandum in opposition to Defendants' motions for summary judgment. Plaintiffs' memorandum only describes two incidents between Olivier and DRE officers. The first incident described in the brief states that Olivier was invited into a Kanabec County squad car driven by Daniel Lewis. ECF No. 166 at 13. Lewis and Schulz (who was allegedly also in the car) then picked up Lorenz and Bell. *Id.* The second incident described in Plaintiffs' memorandum involved Karl Willers. *Id.* at 14. No other officer is mentioned as being part of this incident. *Id.* While no other incident is directly mentioned in the memorandum, Plaintiffs do refer to Olivier's claim that he was provided marijuana by Jacobson and Schuenke. *Id.* at 15. No facts relating to that incident, however, are discussed in the brief. *Id.*

These assertions not only contradict the Amended Complaint, but also Olivier's deposition testimony. As discussed above, the Amended Complaint describes the first incident as between Olivier, McCall, and Schuenke, not Officers Lewis and Schulz. ECF No. 108 ¶ 36. The Amended

Complaint alleges that Officers Lewis and Schulz were involved in the incident with Willers, which is described as the "second occasion." *Id.* ¶ 37. The Amended Complaint also states that *either* Lewis or Schulz were involved in this incident, not both. *Id.* Plaintiffs' memorandum, however, seems to indicate that Lewis *and* Schulz were involved in a separate incident from the one incident with Willers. ECF No. 166 at 13. Olivier also described an officer named "Nick" being involved in the first incident. Olivier Dep. Ex. 6. No officer named "Nick" was involved in the first incident described in the Amended Complaint or the first incident described in Plaintiffs' opposition memorandum.

After reviewing the Amended Complaint, Olivier's deposition testimony, and Plaintiffs' opposition memorandum, it is clear to this Court that neither Olivier nor Plaintiffs' counsel truly know the sequence of events and what officers transported Olivier on which occasions. Olivier readily admits during his deposition that he cannot remember exactly which officers transported him to the DRE facility on any occasion. *Compare, e.g.*, Olivier Dep. 23:1–19 (identifying the officer depicted in the video titled "0033.mov," *see* ECF No. 149, Ex. 12, as Nick Jacobson, the first officer who brought him to the DRE facility), *with* Baker Aff. Ex. 52 (admitting in Request for Admission 14 that the officer depicted in this video was not Nick Jacobson); *see also* Olivier Dep. 30:6–8 (admitting he cannot remember names of officers); *id.* at 39:19–41:10 (after reviewing a video depicting an interaction between Olivier and Jacobson, Olivier admitted he could not remember the name of the officer depicted in the video).

Despite these inconsistencies, a review of Olivier's deposition testimony and videos taken by Occupy Minneapolis protesters clearly reveal two things relevant to Defendants' motions for summary judgment. First, nothing in Olivier's deposition creates an issue of material fact against

Defendant Hadland. Hadland works for Fillmore County, *see* ECF No. 108 at ¶ 9, and Olivier did not indicate anything definite related to Hadland or Fillmore County during his deposition. Specifically, Olivier admitted that he had "heard of Fillmore County before" but he did not know if he ever went with anyone from Fillmore County, including Hadland. Olivier Dep. 148:19–149:18. Because Olivier has offered no evidence other than pure speculation against Hadland, his Fourteenth Amendment claim against Hadland cannot survive summary judgment. *See Putman v. Unity Health Sys.*, 348 F.3d 732, 733–34 (8th Cir. 2003) ("To survive a motion for summary judgment, the nonmoving party must substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy." (internal quotation marks omitted)); *see also* Fed. R. Civ. P. 56(c)(1).

Second, there is no evidence in the record to suggest that Olivier's participation as a subject in the DRE program was anything but completely voluntary. During his deposition, Olivier stated that he first found out about the DRE program from his friend and co-Plaintiff, Wia Day. Olivier Dep. 13:22–14:19. According to Olivier, Day told him that the police were getting individuals high on drugs in order to run tests on them. *Id.* at 13:24–14:3. Although Olivier stated he was surprised that police officers were doing this, he was interested in the program and wanted to participate. *Id.* at 14:6–15:14. Olivier explicitly stated that no one forced him to take part in the program. *Id.* at 15:17–19.

Video taken by members of Occupy Minneapolis support Olivier's voluntary participation in the program. In a video titled "FILE0033.AVI," Olivier is seen talking to Day about her experience with the DRE program. ECF No. 149, Ex. 12 at 0:50–2:42. Day told him that the police were doing training and anyone could participate if they were 18 years old or older. *Id.* Olivier then

eagerly asked Day, "Can I do it?" *Id.* He then requested that Day accompany him to talk to the officers. *Id.* The video follows Olivier and Day as they run over to speak with two unidentified officers. *Id.* Following a discussion with the officers, Olivier is seen voluntarily getting into the back of a Kanabec County squad car. *Id.* Olivier was not handcuffed or placed under arrest. *Id.* This video corroborates Olivier's deposition testimony that no one forced him to participate in the program.

In a second video titled "Untilted1.mov," Olivier and his friend Jay are seen walking with four officers. ECF No. 156 Ex. 28; *see also* Olivier Dep. 43:23–24 (indicating that the person with him was his friend Jay). Olivier and Jay are filmed voluntarily entering a Chisago County squad car. *Id.* Olivier was not under arrest and he opened the car door himself prior to getting in to the back seat. *Id.* The recording then shows an unknown officer confirming with Olivier and Jay that they know they are not in trouble for anything. *Id.* Two of the officers are seen getting into a separate car (a state trooper squad) and drive off, while the remaining two officers get into the Chisago County car. *Id.* The video then shows Olivier in the backseat through the window giving the camera a "thumbs up" sign. *Id.*; *see also* ECF No. 156, Ex. 29 (a separate video of the same incident shows Olivier waving to the camera from the backseat of the squad car). Olivier confirmed in his deposition that he was in fact giving a "thumbs up" sign. *See* Olivier Dep. 43:25–44:2.

Additional recordings show Officer Schuenke having conversations with Olivier. *See, e.g.*, ECF No. 156, Ex. 55. Although one of the recordings contains mainly audio, and no video, the audio confirms that an officer who sounds like Schuenke informed Olivier of the purpose of the evaluations. *Id.* Olivier also requested this officer's contact information so that he could participate in an evaluation at a later date. *Id.*

All of this video evidence, in addition to Olivier's deposition, demonstrates that Olivier

voluntarily participated as a subject in the DRE program. Although Plaintiffs claim that they were told they would be arrested if they did not participate, there is nothing in the record to suggest that Olivier himself was ever threatened with arrest if he did not participate. As stated above, Olivier explicitly stated in his deposition that no one ever forced him to participate, and that he was informed of the true purpose of the program. Because there is no issue of material fact as to Olivier's voluntary participation as a subject in the DRE program, the Court concludes that he cannot prevail on his substantive due process claim. Summary judgment must be granted in favor of Defendants on Olivier's § 1983 claim for violation of his substantive due process rights under the Fourteenth Amendment.

### 2.    Daniel Bell and Zachary Lorenz

According to the Amended Complaint, step-brothers Bell and Lorenz were picked up by Lewis and Schulz and brought to the DRE testing facility for evaluations. ECF No. 108 at ¶ 46. Lewis and Schulz are alleged to have provided Bell and Lorenz with marijuana, which they smoked prior to being tested. *Id.* Olivier was also with Bell and Lorenz when they were picked up by Lewis and Schulz. *See* ECF No. 166 at 13.

During his deposition, Lorenz testified that he found out about the DRE program from his stepsister and co-Plaintiff Wia Day. Lorenz Dep. 8:11–20, ECF No. 149-3. Day told him that law enforcement officers were giving people marijuana for free. *Id.* at 18:16–19. He stated that he was also told that the DRE officers were trying to see how people would act when they were under the influence. *Id.* at 8:11–20. Lorenz could not remember either of the officers' names who picked him up, but he stated that the name Steve sounded familiar. *Id.* at 17:19–21. However, the name Dan Lewis did not sound familiar to Lorenz. *Id.* at 17:25–18:1. Later in his deposition, Lorenz admitted

that he could not remember either of the officers' names. *Id.* at 23:13–16 (Q: How many officers were in there? A: Two. Q: And you're not sure of the names. A: No.). Lorenz also stated that he did not remember having any interactions with officers from any particular county other than Kanabec. *Id.* at 49:1–6.

Lorenz admitted in his deposition that he voluntarily participated in the DRE program. *See id.* at 24:15–25:2. Specifically, Lorenz testified that the officers informed him that they were part of the DRE program when they pulled up to his location. *Id.* at 24:9–14. He responded that he knew who they were and then "just hopped in the back." *Id.* According to Lorenz, he voluntarily got in the back of the squad car, no one forced him to get into the car, and he got in under his own power. *Id.* at 24:15–25:2.

Bell similarly testified during his deposition that Day called him and told him that officers were giving out marijuana in order to observe the effects of the drug on the person. Bell Dep. 9:19–22, 11:15–22, ECF No. 149-4. Day's deposition testimony corroborates that she informed both Lorenz and Bell of the DRE program. *See* Day Dep. 39:25–40:18. Bell further stated that no one forced him to participate; he did it because his brother was participating. ECF No. 149-4 at 11:23–12:4. He also testified that no officer threatened him or said that he would be arrested if he failed to participate. *Id.* at 29:1–5.

Bell stated that he could not remember any of the officers' names who transported him to the DRE facility. Indeed, he stated that the names Steve Schulz and Dan Lewis did not sound familiar to him. *Id.* at 16:18–25. He also could not remember how many officers were in the car with him. *Id.* at 14:9–15. While Bell initially stated that the vehicle was a Kanabec County vehicle, he later admitted that he only believed this because it looked like another vehicle he later saw in a

video. *Id.* at 12:23–13:13. However, at the time he was picked up, he did not know if the vehicle was a Kanabec County squad car. *Id.* at 13:11–13.

Although there is no video evidence of this interaction between Lorenz, Bell, and, allegedly, Officers Schulz and Lewis,[4] it is clear from the records that Lorenz and Bell participated in the program voluntarily. Nothing suggests that they were coerced or intimidated by the officers to participate. Both stated that they knew about the program and its stated purpose. There is nothing in either person's deposition testimony that indicates that their participation was anything but voluntary. Because there is no issue of material fact as to Lorenz's and Bell's voluntary participation as subjects in the DRE program, the Court concludes that they cannot prevail on their substantive due process claim against Lewis and Schulz. Summary judgment must be granted in favor of Defendants Lewis and Schulz on Lorenz and Bell's § 1983 claim for violation of their substantive due process rights under the Fourteenth Amendment.

### 3. Wia Day

#### a. Claims against Karl Willers, Kenneth Willers, Nicholas Jacobson, Bryce Schuenke, and Michael Hadland

With respect to Plaintiff Wia Day, the Amended Complaint makes allegations against only Defendants Daniel Lewis, Steve Schulz, and Kanabec County. ECF No. 108 ¶ 45. There are no allegations or evidence in the record to suggest that any of the other named Defendants deprived

---

[4]     Lorenz and Bell only name Defendants Schulz and Lewis as officers that they may have interacted with. Nothing in the record indicates that Defendants Karl Willers, Kenneth Willers, Nicholas Jacobson, Bryce Schuenke, or Michael Hadland interacted with Lorenz or Bell in a way that could have deprived them of their substantive due process right to bodily integrity protected by the Fourteenth Amendment. Any claims by Lorenz or Bell against these Defendants cannot survive summary judgment.

Day of any of her constitutional rights. Summary judgment must therefore be granted in favor of

Defendants Karl Willers, Kenneth Willers, Jacobson, Schuenke, and Hadland on Day's § 1983 claim

for violation of her substantive due process rights under the Fourteenth Amendment.

### b.      Claim against Steve Schulz

Day alleges in the Amended Complaint that she was picked up by Officers Lewis and Schulz

and brought to the DRE testing facility for evaluation. ECF No. 108 at ¶ 45. At that point, Day

claims that Lewis and Schulz provided her with marijuana to smoke before she was evaluated. *Id.*

The evidence in the record contradicts Day's allegation that Schulz was one of the officers

who brought her to the DRE facility. Schulz explicitly stated in his deposition that he did not attend

the DRE program in 2012, and that Officer Lewis was the only individual from Kanabec County

who attended that year. Schulz Dep. 5:16–6:3, ECF No. 149-6. In addition, the 2012 DRE School

Student Roster does not list Schulz as a participant. *See* ECF No. 149, Ex. 11.

While Day testified that officers from Kanabec County picked her up and brought her to the

testing facility, she admits that she did not know for sure if Schulz was one of the persons who

brought her in for an evaluation. *See* Day Dep. 21:20–23, ECF No. 149-1 ("A: I approached the

officers. One was named Daniel and the other one I think was Steve, from Kanabec County. Q: Do

you know their last names? A: No, I don't recall their last names."). Although she identified both

Steve Schulz and Daniel Lewis later in her deposition, she did not do so until after she was provided

with their names from by the attorney deposing her. *See id.* at 21:25–22:3. Day also stated during

her deposition that the officers were wearing different colored uniforms—one was wearing a brown,

state trooper-type uniform, while the other was wearing a black uniform. *Id.* at 27:3–5. She could

not, however, remember which officer was wearing which uniform. *Id.* at 27:6–9.

It is true that all inferences must be viewed in the light most favorable to the non-moving party when deciding a motion for summary judgment. *See Scott v. Harris*, 550 U.S. 372, 378 (2007). "In order to survive a motion for summary judgment, however, the non-moving party must be able to 'substantiate [her] allegations with sufficient probative evidence that would permit a finding in [her] favor based on more than mere speculation, conjecture, or fantasy.'" *Habib v. NationsBank*, 279 F.3d 563, 567 (8th Cir. 2001) (quoting *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995)); *see also* Fed. R. Civ. P. 56(c)(1). Given that Day has not put forth any non-speculative evidence to contradict either Schulz's testimony that he did not participate in the DRE program or the class roster that does not list Schulz as an attendee, her claim cannot survive summary judgment. Summary judgment must be granted in favor of Defendant Schulz on Day's § 1983 claim for violation of her substantive due process rights under the Fourteenth Amendment.

### c.    Claim against Daniel Lewis

#### i.    An issue of material fact exists as to whether Lewis brought Day to the testing facility

As to Defendant Lewis, the Court concludes that Day has alleged more than "mere speculation" that Lewis was one of the officers who brought her in for a DRE examination. Day stated in her deposition that she approached Lewis to discuss the DRE program. ECF No. 149-1 at 21:20–22. Unlike when Day named Schulz, Day did not equivocate when she identified "Daniel" in her deposition. *Id.* (stating that "[o]ne was named Daniel and the other one *I think* was Steve" (emphasis added)). Day also indicated that the squad car that transported her to the testing facility was from Kanabec County, the County for which Lewis worked. *Id.* at 27:19–22. Day claimed that after volunteering to participate in the DRE program, Lewis and another officer drove her to a secluded location near the DRE facility and gave her and a friend three bowls of marijuana to

smoke. *Id.* at 22:23–23:2. After going through the DRE officer's evaluation, Day stated she was returned to Peavey Plaza. *Id.* at 36:15–18.

During Lewis's deposition, he stated that although he could not remember exactly how many individuals he brought to the DRE facility, it was possible that he brought as many as six persons in for an evaluation. Lewis Dep. 53:10–21, ECF No. 149-7. Lewis, however, denied ever finding a female volunteer at Peavey Plaza. *Id.* at 59:3–60:6. He acknowledged that he dropped off both a male and a female volunteer at Peavey Plaza that had been brought in by a different group. *Id.* at 56:15–59:19.

Although Lewis's and Day's deposition testimony conflict, it is up to a jury, not the Court, to weigh each witness's credibility. A reasonable jury could believe either Day or Lewis. The Court therefore concludes that an issue of material fact exists as to whether Lewis was one of the officers who brought Day to the testing facility.

## ii.    An issue of material fact exists as to whether Day consented to the DRE testing

The Court also finds that an issue of material fact exists as to whether Day's participation in the DRE program was truly voluntary. As stated above, an individual who voluntarily participates in a program cannot later complain of due process violations.

Day clearly stated in her deposition that she approached the officers because she wanted to participate in the program. *See id.* at 21:20–22. After explaining the program to Day, the officers asked if she was willing to volunteer to be evaluated. *Id.* at 27:23–28:17. Day agreed and voluntarily got into the squad car. *Id.* at 28:21–24. These facts, on the surface, appear to indicate that Day fully consented to participating in the program.

Unlike the previously-discussed Plaintiffs, however, Day was adjudicated to be an

28

"incapacitated person" under the laws of Minnesota, and she was appointed a legal guardian to care for her in 2008. *See* Milstein Decl. Ex. F, at 3–5, ECF No. 167. According to the Order appointing Day a legal guardian, Day "is incapacitated with regard to her person because she is impaired to the extent of lacking sufficient understanding or capacity to make or communicate responsible decisions concerning her personal needs for medical care, nutrition, clothing, shelter or safety." *Id.* at 3. Day "can read and write at a 2nd grade level," "is very friendly and trusting toward people she does not know," "needs assistance with making informed medical decisions," and "does not understand contracts." *Id.* Day's mother, Judith Day, was appointed as her guardian. *Id.* at 1. Indeed, Day's mother accompanied Day to her deposition. *See* ECF No. 149-1 at 3:11–20.

As discussed above, in all of the cases involving Fourteenth Amendment violations of one's bodily integrity, voluntariness has been a cornerstone of the decisions. *See, e.g.*, *Heinrich v. Sweet*, 62 F. Supp. 2d 282 (D. Mass. 1999); *In re Cincinnati Radiation Litig.*, 874 F. Supp. 796 (S.D. Ohio 1995). Given that Day has placed her mental incapacity to consent at issue in this case, it is up to a jury to determine whether Day's substantive due process right to bodily integrity was violated. *See Lee ex rel. Lee v. Borders*, 764 F.3d 966, 972 (8th Cir. 2014) (finding jury instruction as to "consent" was valid in a § 1983 case for deprivation of the plaintiff's substantive due process right to bodily integrity when the plaintiff put her mental capacity at issue). In addition, it is a jury's decision to determine whether the conduct alleged by Day was so conscience-shocking that it violated her substantive due process rights protected by the Fourteenth Amendment.

### iii.    Lewis is not entitled to qualified immunity

The doctrine of qualified immunity shields state actors from liability under section 1983 unless the official's conduct "violates a clearly established constitutional or statutory right of which

a reasonable person would have known." *LaCross v. City of Duluth*, 713 F.3d 1155, 1157 (8th Cir. 2013). Two questions are considered when determining whether government officials are protected by qualified immunity: "[1] whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and [2] whether that right was clearly established at the time of the defendant's alleged misconduct." *Id.* at 1157–58. As discussed above, an issue of material fact exists for trial as to whether Day's substantive due process right to bodily integrity under the Fourteenth Amendment was violated by Lewis. The Court therefore turns to the second criterion; namely, whether such right was clearly established at the time of Lewis's alleged misconduct.

The Supreme Court has made clear that there need not be a case with materially or fundamentally similar facts in order for a reasonable person to know that his or her conduct violated the Constitution. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent.")

As discussed in both the Court's previous Report and Recommendation and in Judge Tunheim's Order, the fundamental constitutional protection of bodily integrity under the Fourteenth Amendment was clearly established at the time of the alleged unconstitutional conduct of Lewis. *See* ECF No. 78 at 16–17; ECF No. 86 at 23–26. Although no party has presented the Court with a case directly comparable to the present one, "[i]t is now well-established that officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Sisney v. Reisch*, 674 F.3d 839, 947 (8th Cir. 2012). The Court concludes that qualified immunity does not shield Lewis from Day's allegations because a reasonable officer should have known that providing illicit drugs to an incapacitated person in order to run observational tests violates clearly established

law.

Based on the foregoing, the Court concludes that Day's claim against Lewis for depravation of her substantive due process right to bodily integrity protected by the Fourteenth Amendment must survive Lewis's motion for summary judgment.

### 4.     Adam Luguna

According to the Amended Complaint, Defendants Schuenke and Hadland picked up Luguna, took him to the DRE facility for an evaluation, provided him with marijuana to smoke, and released him while he was still under the influence. ECF No. 108 ¶ 44.

According to Luguna's deposition testimony, he was approached by two officers in a Fillmore County squad car. Luguna Dep. 28:22–29:4, ECF No. 149-5. Luguna stated that he and a friend had just finished smoking marijuana. *Id.* at 32:18–34:6. When the officers approached him, his friend attempted to hide a marijuana cigarette under her leg. *Id.* The officers informed Luguna that they were part of the DRE program and explained to him what the program was. *Id.* Then, one of the officers allegedly told Luguna and his friend that they could either volunteer to be in the program, or the officers would take both of them to the county jail for marijuana possession and hold them for 72-hours. *Id.* According to Luguna, his friend was pregnant and he did not want either of them to go to jail, so he agreed to participate in the program. *Id.* Luguna stated that he felt like he was forced and bullied into participating in the program. *Id.* at 36:22–37:5, 40:22–23. He claims that he was physically escorted to the squad car, and the officers had a grasp on him so that he could not go anywhere. *Id.* at 41:7–17.

Once Luguna was at the facility, he stated that he was provided with a large bag of marijuana to smoke. *Id.* at 52:17–53:6. A third officer escorted him to the back of the testing facility, where

he smoked the bag of marijuana. *Id.* at 55:7–24. Once Luguna was high, he was evaluated, and the same officers who picked him up brought him back to Peavey Plaza. *Id.* at 63:18–24.

This deposition testimony, however, is in stark contrast from statements Luguna made in an interview that was recorded by a member of Occupy Minneapolis on the same day Luguna was evaluated. *See* ECF No. 149, Ex. 14. During this interview, Luguna stated that he first heard about the DRE program from a friend who had been evaluated by DRE officers, and Luguna "wanted to find out what they were up to."*Id.* When asked about his interaction with the DRE officers, Luguna stated that the officers walked over to him and a friend, explained the program, and asked if they wanted to participate. *Id.* Luguna's friend said, "Yeah, why not." *Id.* Luguna did not mention being threatened with arrest if he refused to participate. The interviewer then asked Luguna what kind of law enforcement officers were looking for volunteers, and Luguna said that some were state troopers and some were officers from Dakota County. *Id.* He also said other entities were involved, but the only municipality that he could name other than Dakota County was Shakopee.*Id.* At no time during the interview did Luguna mention Fillmore County. *Id.* When one of the interviewers asked Luguna whether he was given drugs by any of the officers, Luguna said no and that he had to already be under the influence before he could participate.*Id.* Luguna explicitly denied ever smoking marijuana in the presence of any DRE officer. *Id.*

### a.    Claim against Schuenke

Although Luguna's Amended Complaint alleges that Schuenke was one of the officers who picked him up from Peavey Plaza and provided him with drugs, the evidence in the record suggests otherwise. During his deposition, Luguna was asked when he learned that one of the officers with whom he had contact was named Bryce Schuenke. *Id.* at 68:15–18. Luguna responded that

32

Schuenke's name was brought up at some point in discussions with his lawyer, and he believed that

Schuenke *could* be one of the officers because "that name sounded so familiar." *Id.* at 68:19–69:10.

Later in his deposition, Luguna clarified his limited familiarity with Schuenke:

> Q:    And so by process of elimination you would agree that Schuenke was the
>        short, fat guy?
>
> A:    No, I don't know necessarily that I had direct contact with Officer Schuenke,
>        I just know that I have heard the name.
>
> Q:    Okay. So you don't know if Officer Schuenke was involved in transporting
>        you to or from the facility.
>
> A:    No, I do not. His name could have just been mentioned while I was there.
>
> Q:    So the short, fat guy could in fact be some different person.
>
> A:    Yes. I — like I said, I believe his name — I'm pretty positive his last name
>        started with a "K", so—
>
> Q:    . . . [W]ould you agree that Bryce Schuenke didn't give you any marijuana?
>
> A:    It's possible that he did not, but I'm not going to completely rule it out.
>        Because, like I said, I know the name, I — but I just may have only heard it
>        because I — while I was in there, in the facility.

*Id.* at 84:17–85:15. In Luguna's responses to Dakota County's Requests for Admissions, Luguna

admitted that (1) Schuenke did not transport him from Peavey Plaza to the DRE facility, (2)

Schuenke did not coerce him into participating in the program, (3) Schuenke did not offer or provide

him with marijuana, and (4) Schuenke was not present at any time when he received marijuana from

a law enforcement officer. Baker Aff. Ex. 59, ECF No. 156.

    Based on the foregoing, the Court concludes that summary judgment must be granted in

favor of Schuenke on Luguna's substantive due process claim. As stated above, "[i]n order to

survive a motion for summary judgment . . . the non-moving party must be able to 'substantiate his

33

allegations with sufficient probative evidence that would permit a finding in his favor based on more than mere speculation, conjecture, or fantasy.'" *Habib*, 279 F.3d at 567 (quoting *Int'l Bus. Machs. Corp.*, 62 F.3d at 241); *see also* Fed. R. Civ. P. 56.

> **b.      Claim against Hadland**

As previously mentioned, Luguna's Amended Complaint alleges that Hadland was one of the officers that threatened to place Luguna in jail if he did not participate in the DRE program. Although Luguna did not mention this threat in his recorded interview, all inferences must be viewed in the light most favorable to the non-moving party. *See Scott*, 550 U.S. at 378. Assuming without deciding that this threat by the officer vitiated any consent that Luguna provided, the Court nevertheless concludes that Luguna's claims against Hadland are only speculation and cannot survive summary judgment.

During his deposition, Luguna described one of the officers as "short" and "fat" and, according to Luguna, had a name that started with the letter "K." ECF No. 149-5 at 32:5–7. As to the other officer, Luguna stated that "he was just tall and bald, and I didn't even bother to look at his name tag, or if I did, I can't even remember looking at it." *Id.* at 32:8–10. Later in his deposition, Luguna was asked if the name Michael Hadland sounded familiar to him. Luguna stated, "I want to say that's the taller, bald guy. . . I believe his name was Michael. I didn't—I didn't know his last name." *Id.* at 70:8–12. Luguna additionally admitted that he could not narrow the Defendant officers down to two specific names: "[T]here's so many names on this—and that's the problem: there's so many names on there, I couldn't narrow it down to a specific two names. I—I mean I could if I—but I—I would be guessing." Indeed, Luguna did not mention Fillmore County or Hadland in his recorded interview with Occupy Minneapolis immediately following his evaluation. ECF No. 149,

Ex. 14.

It is clear to the Court that Luguna's identification of Hadland as one of the officers who took him to the DRE facility is mere conjecture. Luguna admitted that he would be "guessing" as to any of the identities of the officers with whom he interacted. A plaintiff must provide more than mere conjecture or speculation in order to survive a motion for summary judgment. Summary judgment must therefore be granted in favor of Defendant Hadland on Luguna's § 1983 claim for violation of his substantive due process rights under the Fourteenth Amendment.

**C.    Plaintiffs' failure to train claims**

Finally, all Plaintiffs assert *Monell* claims against the following municipal entities employing the Defendant law enforcement officers for failure to train: City of Hutchinson, Nobles County, Olmsted County, Dakota County, Pine County, Kanabec County, and Fillmore County. ECF No. 108.

In *Monell v. Department of Social Services*, the Supreme Court held that a municipality is a "person" that can be held liable under § 1983. 436 U.S. 658, 690 (1978). However, "a municipality cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor." *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 389 (8th Cir. 2007) (citing *Monell*, 436 U.S. at 691); *see also Connick v. Thompson*, 563 U.S. 51, 60 (2011) (stating that under § 1983, local governments are responsible only for their own illegal acts; they are not vicariously liable under § 1983 for their employees' actions). Plaintiffs who seek to impose liability on municipalities must prove that their injuries were caused by "action pursuant to official municipal policy." *Monell*, 436 U.S. at 691. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the

force of law." *Connick*, 563 U.S. at 61. In limited circumstances, however, a municipality's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to an official government policy for purposes of § 1983. *Id.* "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* To satisfy § 1983, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

### 1.    Pine County

Although Pine County is a named Defendant, there is nothing in the record to suggest that any officer from Pine County was present for the DRE program. *See* Angolkar Aff. Ex. 11 (showing no officers from Pine County on the 2012 DRE School Roster). Plaintiffs make no specific allegations against Pine County itself, or any officer from Pine County, in their Amended Complaint. *See generally* ECF No. 108. Because no issues of genuine fact exist to support any § 1983 failure to train claim against Pine County, Pine County's motion for summary judgment must be granted.

### 2.    City of Hutchinson, Nobles County, Olmsted County, Dakota County, and Fillmore County

As discussed in detail above, all of Plaintiffs' § 1983 claims against Defendants Karl Willers, Kenneth Willers, Nicholas Jacobson, Bryce Schuenke, Steve Schulz, and Michael Hadland cannot survive summary judgment. "Without a constitutional violation by the individual officers, there can be no § 1983 or *Monell* failure to train municipal liability." *Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). Summary judgment must be granted in favor of Defendants City of Hutchinson, Nobles County, Olmsted County, Dakota County, and Fillmore County (the municipalities employing the Defendants whose

motions for summary judgment should be granted) on Plaintiffs' § 1983 failure to train claims.

### 3.     Kanabec County

The only claim by any Plaintiff that the Court has determined can survive summary judgment is a claim by Wia Day against Officer Daniel Lewis of Kanabec County for violation of her substantive due process right to bodily integrity.[5] The Court therefore addresses Day's claim for *Monell* liability against Kanabec County.

As stated above, to satisfy § 1983, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick*, 563 U.S.at 61. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* Ordinarily, a defendant must show a pattern of similar constitutional violations by untrained employees to demonstrate deliberate indifference for purposes of failure to train. *Id.* at 62 (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). A municipality's continued adherence to an approach that it knows or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of its action—the deliberate indifference—necessary to trigger municipal liability. "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

It does not appear that Day contends that a pattern of similar constitutional violations placed

---

[5]     Because Day is the only Plaintiff whose § 1983 claim against Kanabec County survived summary judgment, any *Monell* claim by Plaintiffs Olivier, Luguna, Bell, or Lorenz against Kanabec County likewise cannot survive. *See Sanders*, 474 F.3d at 527.

Kanabec County on notice that its training was deficient. *See generally* ECF No. 166 at 32–35. There is no evidence in the record to suggest that there was a history of officers providing marijuana to individuals as part of the DRE program or that any officers in past DRE programs used non-voluntary subjects for observation. In fact, Kanabec County Sheriff Steve Schulz testified that Lewis was the first officer from Kanabec County to ever attend the DRE program. The Court therefore concludes that there were no previous incidents that could have placed Kanabec County on notice that specific training was necessary to avoid the constitutional violation alleged by Day.

Instead of relying on a pattern of similar constitutional violations, Day relies on the "single-incident" theory of liability. Under this theory, the Supreme Court has recognized that "in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference." *Connick*, 563 U.S. at 63 (internal quotation marks omitted). In recognizing this theory, the Supreme Court "sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 64.

As observed in *Connick*:

> In [*City of Canton v. Harris*], the Court left open the possibility that, in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference. The Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force. 489 U.S. 378, 390 n.10 (1989). Given the known frequency with which police attempt to arrest fleeing felons and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights, the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the highly predictable consequence, namely, violations of constitutional rights.

563 U.S. at 63–64 (internal citations omitted). In *Connick*, the Court held that the failure to train

prosecutors in their *Brady* obligations did not fall within the narrow scope of *Canton*'s hypothesized single-incident liability. The Court observed that "[t]he obvious need for specific legal training that was present in the *Canton* scenario is absent here." *Id.* at 64. The Court noted that under the circumstances outlined in *Canton*, an obvious need for training exists. In contrast, in the case of prosecutors, "legal training is what differentiates attorneys from average public employees." *Id.*

The Fifth Circuit applied the single-incident theory of *Monell* liability in the case *Brown v. Bryan County*, 219 F.3d 450 (5th Cir. 2000). In *Brown*, the defendant failed to provide any supervision or training to a young, inexperienced sheriff's deputy. The deputy participated in a car chase and arrest involving the use of force. Because of the manner in which the deputy effectuated the arrest, the plaintiff suffered severe knee injuries. *Id.* at 452. The Fifth Circuit held that "the jury reasonably could have concluded that it was obvious to [the Sheriff] that his policy decision not to train [the deputy] would result in a constitutional deprivation. . . . [The Sheriff's] considered policy decision not to require training for [the deputy] can be said to constitute 'deliberate indifference' to the Fourth Amendment rights of those citizens [the deputy] would encounter." *Id.* at 463.

However, the Eighth Circuit declined to apply the single-incident theory in *Parrish v. Ball*, 594 F.3d 993 (8th Cir. 2010). In *Parrish*, the defendant was hired as a police deputy and received little to no training on how to properly serve in that capacity. After arresting the plaintiff, the defendant sexually assaulted her in the jail. *Id.* at 996. In the plaintiff's subsequent § 1983 action, the county employing the defendant was held liable for failure to train. *Id.* at 997. On appeal, the Eighth Circuit reversed, holding that there was no "patently obvious need to train an officer not to sexually assault women." *Id.* at 999. The court continued, "[W]hile it may have been wise to tell officers not to sexually assault detainees, it is not so obvious that not doing so would result in an

officer actually sexually assaulting a female detainee." *Id.*

The Court concludes that the question of whether Kanabec County was deliberately indifferent to the rights of individuals with whom the untrained employee would come in contract is more appropriately determined by a jury. The Court observes that the facts of the present case seem to fall somewhere between *Connick*, on one end of the "patently obvious" spectrum, and *Canton*, on the other end. It is the jury's prerogative to determine where on that spectrum the facts of this case lie. *See United States v. Gaudin*, 515 U.S. 506, 514 (1995) (stating that "the jury's constitutional responsibility is not merely to determine the facts, but to apply the law to those facts and draw the ultimate conclusion"). This case is not so similar to *Parrish* to justify deciding this question as a matter of law. It must be a jury that determines whether there is a patently obvious need to train an officer to gain proper consent from a participant, and refrain from giving that participant illicit drugs, before subjecting her to bodily testing.

To the extent Kanabec County's motion seeks summary judgment on Day's § 1983 failure to train claim, the motion must be denied.

## IV. RECOMMENDATION

Based upon the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

A.    The City and County Defendants' motion for summary judgment (ECF No. 147) be **GRANTED in part** and **DENIED in part** as follows:

    1.    To the extent the motion seeks summary judgment in favor of Defendant Daniel Lewis on Plaintiff Wia Day's § 1983 claim for deprivation of her substantive due process right to bodily integrity protected by the Fourteenth Amendment, the motion should be **DENIED**;

    2.    To the extent the motion seeks summary judgment in favor of Defendant Kanabec County on Plaintiff Wia Day's *Monell* claim, the motion should be **DENIED**;

        3.      In all other respects, the motion should be **GRANTED**;

B.      Defendants Nicholas Jacobson and Olmsted County's motion for summary judgment (ECF No. 153) be **GRANTED**;

C.      Defendants Bryce Schuenke and Dakota County's motion for summary judgment (ECF No. 161) be **GRANTED**.


DATED: January 13, 2016                *s/Franklin L. Noel*
                                            FRANKLIN L. NOEL
                                            United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **January 27, 2016**, written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **January 27, 2016**, a complete transcript of the hearing.


This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.